ORAL ARGUMENT NOT YET SCHEDULED

No. 15-1211 (and consolidated cases)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ACA INTERNATIONAL, *et al.*,

*Petitioners*,

CAVALRY PORTFOLIO SERVICES, LLC, *et al.*,

*Intervenors for Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

William J. Baer
    *Assistant Attorney General*
Kristen C. Limarzi
Steven J. Mintz
    *Attorneys*
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

Jonathan B. Sallet
    *General Counsel*
David M. Gossett
    *Deputy General Counsel*
Jacob M. Lewis
    *Associate General Counsel*
Scott M. Noveck
    *Counsel*
FEDERAL COMMUNICATIONS
    COMMISSION
445 12th Street SW
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici.**  The Petitioners are:

- No. 15-1211: ACA International

- Nos. 15-1218 and 15-1441: Sirius XM Radio Inc.

- Nos. 15-1244 and 15-1440: Professional Association for Customer Engagement, Inc.

- No. 15-1290: salesforce.com inc. and ExactTarget, Inc.

- No. 15-1304: Consumer Bankers Association

- No. 15-1306: Chamber of Commerce of the United States of America

- No. 15-1311: Vibes Media, LLC

- No. 15-1313: Rite Aid Hdqtrs. Corp.

- No. 15-1314: Portfolio Recovery Associates, LLC

The following parties have intervened in support of Petitioners:

- Cavalry Portfolio Services, LLC, Diversified Consultants, Inc., Mercantile Adjustment Bureau, and MRS BPO, LLC

- Council of American Survey Research Organizations and Marketing Research Association

- National Association of Federal Credit Unions

- Conifer Revenue Cycle Solutions, LLC

- Gerzhom, Inc.

The following *amici* have filed briefs in support of Petitioners:

- American Bankers Association, Credit Union National Association, and the Independent Community Bankers of America

- American Financial Services Association, Consumer Mortgage Coalition, and Mortgage Bankers Association

- American Gas Association, Edison Electric Institute, National Association of Water Companies, and National Rural Electric Cooperative Association

- Communication Innovators

- CTIA—The Wireless Association

- The Internet Association

- Charles R. Messer

- National Association of Chain Drug Stores, Inc.

- Retail Litigation Center, Inc., National Retail Federation, and National Restaurant Association

The Respondents are the Federal Communications Commission and the United States of America. The following *amici* have filed briefs in support of Respondents:

- National Consumer Law Center, National Association of Consumer Advocates, Consumers Union, AARP, Consumer Federation of America, and MFY Legal Services

- Electronic Privacy Information Center, Constitutional Alliance, Consumer Watchdog, Cyber Privacy Project, Patient Privacy Rights, Privacy Rights Clearinghouse, and Privacy Times

(B) **Rulings Under Review.** The petitions for review challenge aspects of the Federal Communications Commission's Declaratory Ruling & Order, *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (*Omnibus Ruling* or *Order*), *reprinted at* JA1144-281.

(C) **Related Cases.** The *Omnibus Ruling* has not previously been before this Court or any other court.  Respondents are not aware of any related cases in this Court.  Three cases pending in other circuits involve some of the same issues as this case.  *King v. Time Warner Cable Inc.*, No. 15-2474 (2d Cir.); *Sterling v. Mercantile Adjustment Bureau, LLC*, No. 14-1247 (2d Cir.); *Marks v. Crunch San Diego, LLC*, No. 14-56834 (9th Cir.). Respondents understand that several Petitioners (and their Intervenors and *amici*) or their members are defendants in pending private suits, to which Respondents are not parties, that involve some of the same issues as this case.  *See*, *e.g.*, *Zani v. Rite Aid Corp.*, No. 1:14-cv-09701 (S.D.N.Y.); *Hooker v. Sirius XM Radio Inc.*, No. 4:13-cv-00003 (E.D. Va.).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
    AND RELATED CASES ..........................................................................i

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY.........................................................................................xv

INTRODUCTION...................................................................................1

STATEMENT OF THE ISSUES .............................................................6

JURISDICTIONAL STATEMENT .........................................................8

PERTINENT STATUTES AND REGULATIONS ...................................8

STATEMENT OF THE CASE ................................................................8

    A.    Statutory And Regulatory Background .................................8

    B.    Issues Relevant To This Appeal ........................................12

        1.    Autodialers ...............................................................12

        2.    Reassigned Wireless Numbers ...................................16

        3.    Revoking Consent ......................................................19

        4.    Exemptions For Certain Healthcare Calls..................21

STANDARD OF REVIEW .....................................................................22

SUMMARY OF THE ARGUMENT.........................................................24

ARGUMENT..........................................................................................26

I.    The Commission's Treatment Of Autodialers Is Reasonable
    And Consistent With The Statutory Text......................................26

    A.    The Commission's Ruling That "Capacity" Need Not
    Be Limited To "Present Capacity" Is Reasonable And
    Consistent With The Statutory Text. ...................................27

    B.    The Commission's Treatment Of Devices That Call
    Stored Lists Of Numbers Is Not Properly Before The
    Court, But In Any Event Is Reasonable And Consistent
    With The Statutory Text.......................................................36

(iv)

# TABLE OF CONTENTS
## (continued)

**Page**

    1.   The FCC's Approach Is Consistent With The Statutory Text. ................................................. 38

    2.   The FCC's Approach Is Reasonable. ........................... 44

    3.   Congress Has Ratified The FCC's Approach. .............. 49

C.   The TCPA's Autodialer Restrictions Are Not Unconstitutionally Vague. ..................................... 52

II.   The Commission Reasonably Concluded That Callers Must Obtain New Consent For Calls To Reassigned Wireless Numbers, Subject To A One-Call Safe Harbor. ............................ 54

A.   The Commission Reasonably Interpreted "Consent Of The Called Party" To Refer To The Person Whose Telephone Number Is Called. ................................ 54

B.   The One-Call Safe Harbor Is Not Arbitrary Or Capricious. ...................................................... 59

III.   The Commission Reasonably Ruled That Callers Must Allow Consumers To Revoke Consent By Any Reasonable Means. ........ 61

IV.   The Commission Reasonably Exempted Certain Healthcare Calls To Wireless Numbers. ........................................... 68

V.   The TCPA's Time, Place, And Manner Restrictions Are Constitutional. .................................................. 72

CONCLUSION ............................................................ 77

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................... 78

CERTIFICATE OF FILING AND SERVICE ................................. 79

# TABLE OF AUTHORITIES*

**Cases:**                                                                               **Page(s)**

*Adirondack Med. Ctr. v. Sebelius,*
740 F.3d 692 (D.C. Cir. 2014) ........................................................ 28

*Beal v. Wyndham Vacation Resorts, Inc.,*
956 F. Supp. 2d 962 (W.D. Wis. 2013) ........................................ 61, 62

*Biggerstaff v. FCC,*
511 F.3d 178 (D.C. Cir. 2007) ........................................................ 37

*Boyce Motor Lines, Inc. v. United States,*
342 U.S. 337 (1952) ........................................................................ 53

*Cablevision Sys. Corp. v. FCC,*
649 F.3d 695 (D.C. Cir. 2011) ........................................................ 74

*Cellco P'ship v. FCC,*
357 F.3d 88 (D.C. Cir. 2004) .......................................................... 23

*Charter Commc'ns, Inc. v. FCC,*
460 F.3d 31 (D.C. Cir. 2006) .......................................................... 38

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
467 U.S. 837 (1984) ...................................................... 22, 23, 62, 64

*City of Arlington v. FCC,*
133 S. Ct. 1863 (2013) .............................................................. 23, 64

*DiCola v. FDA,*
77 F.3d 504 (D.C. Cir. 1996) .......................................................... 53

*Dominguez v. Yahoo, Inc.,*
--- F. App'x ---, 2015 WL 6405811 (3d Cir. 2015) ............................ 40

*FCC v. Fox Television Stations, Inc.,*
129 S. Ct. 1800 (2009) .................................................................... 73

---

* *Authorities upon which we chiefly rely are marked with asterisks.*

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358 (D.C. Cir. 1997) ................................. 67

\* *Gager v. Dell Fin. Servs., LLC*,
727 F.3d 265 (3d Cir. 2013) ....................................... 20, 61, 62, 63, 76

*Gannon v. Network Tel. Servs., Inc.*,
--- F. App'x ---, 2016 WL 145811 (9th Cir. 2016) ............................... 59

*Garcia-Villeda v. Mukasey*,
531 F.3d 141 (2d Cir. 2008) .............................................................. 73

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
134 S. Ct. 604 (2013) ....................................................................... 65

*ICC v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) .......................................................................... 37

\* *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
847 F. Supp. 2d 1253 (S.D. Cal. 2012) ................. 30, 32, 35, 36, 74, 75

\* *Joffe v. Acacia Mortg. Corp.*,
121 P.3d 831 (Ariz. Ct. App. 2005) ................................... 3, 74, 75, 76

*King v. Time Warner Cable*,
113 F. Supp. 3d 718 (S.D.N.Y. 2015), *appeal filed*,
No. 15-2474 (2d Cir.) ................................................................... 54, 57

*Lardner v. Diversified Consultants Inc.*,
17 F. Supp. 3d 1215 (S.D. Fla. 2014) .......................................... 41, 44

*Leyse v. Bank of Am. N.A.*,
804 F.3d 316 (3d Cir. 2015) .............................................................. 54

*Lozano v. Twentieth Century Fox Film Corp.*,
702 F. Supp. 2d 999 (N.D. Ill. 2010) ........................................... 74, 75

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Mainstream Mktg. Servs., Inc. v. FTC,*
  358 F.3d 1228 (10th Cir. 2004) ........................................................ 14

*Mims v. Arrow Fin. Servs., LLC,*
  132 S. Ct. 740 (2012) ........................................................................ 2

*Moore v. Dish Network LLC,*
  57 F. Supp. 3d 639 (N.D. W. Va. 2014), *appeal dismissed,*
  No. 14-2245 (4th Cir. 2015) ........................................ 41, 42, 54, 56

*Morales-Izquierdo v. Gonzales,*
  486 F.3d 484 (9th Cir. 2007) (en banc) ........................................... 73

*Morse v. Allied Interstate, LLC,*
  65 F. Supp. 3d 407 (M.D. Pa. 2014) ................................................ 38

*Moser v. FCC,*
  46 F.3d 970 (9th Cir. 1995) ....................................................... 74, 76

*Munro v. King Broad. Co.,*
  2013 WL 6185233 (W.D. Wash. 2013) ............................................. 62

*N. Haven Bd. of Educ. v. Bell,*
  456 U.S. 512 (1982) .......................................................................... 49

*Nat'l Ass'n of Broad. v. FCC,*
  740 F.2d 1190 (D.C. Cir. 1984) ................................................. 33, 35

*Nat'l Cable & Telecomm. Ass'n v. Brand X,*
  545 U.S. 967 (2005) ............................................ 23, 28, 30, 33, 62

*Nat'l Mining Ass'n v. Kempthorne,*
  512 F.3d 702 (D.C. Cir. 2008) ................................................... 28, 73

*Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.,*
  503 U.S. 407 (1992) .......................................................................... 28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*NLRB v. Rockaway News Supply Co.,*
345 U.S. 71 (1953)..................................................................65

\* *Osorio v. State Farm Bank, F.S.B.,*
746 F.3d 1242 (11th Cir. 2014)........................................ 17, 54, 56, 61

*Perez v. Mortg. Bankers Ass'n,*
135 S. Ct. 1199 (2015)...........................................................37

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n,*
533 F.3d 810 (2008) ..............................................................27

*Republican Nat'l Comm. v. FEC,*
76 F.3d 400 (D.C. Cir. 1996) .................................................74

*Rust v. Sullivan,*
500 U.S. 173 (1991)...........................................................64, 73

*Satterfield v. Simon & Schuster, Inc.,*
569 F.3d 946 (9th Cir. 2009) .................................................10

\* *Soppet v. Enhanced Recovery Co., LLC,*
679 F.3d 637 (7th Cir. 2012)............................ 3, 17, 54, 55, 56, 57, 76

*Sterk v. Path, Inc.,*
46 F. Supp. 3d 813 (N.D. Ill.), *perm. app. denied,*
No. 14-8020 (7th Cir. 2014) ............................................45, 52

*Throckmorton v. Nat'l Transp. Safety Bd.,*
963 F.2d 441 (D.C. Cir. 1992) ...............................................53

*United States v. Edge Broad. Co.,*
509 U.S. 418 (1993)...............................................................61

*United States v. Mezzanatto,*
513 U.S. 196 (1995)...............................................................65

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.,*
  274 F.R.D. 229 (S.D. Ill. 2011)............................................................59

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982)....................................................................52, 53

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)....................................................................74, 75

*Williamson v. Lee Optical Co.,*
  348 U.S. 483 (1955)..........................................................................33

*Wreyford v. Citizens for Transp. Mobility, Inc.,*
  957 F. Supp. 2d 1378 (N.D. Ga. 2013)....................................74, 75, 76

*Young v. Cmty. Nutrition Inst.,*
  476 U.S. 974 (1986)....................................................................23, 43

**Administrative Materials:**

*1992 TCPA Order*:
  Report & Order, *Rules & Regs. Implementing the Tel. Cons.
  Prot. Act of 1991,* 7 FCC Rcd. 8752 (1992) ...................................11, 12

\* *2003 TCPA Order*:
  Report & Order, *Rules & Regs. Implementing the Tel. Cons.
  Prot. Act of 1991*, 18 FCC Rcd. 14014 (2003) ............. 3, 10, 13, 14, 15,
  .................................................................................. 16, 36, 38, 44, 49

*2004 TCPA Order*:
  Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of
  1991*, 19 FCC Rcd. 19215 (2004) ........................................................17

*2005 TCPA Order*:
  Second Order on Reconsideration, *Rules & Regs. Implementing
  the Tel. Cons. Prot. Act of 1991,* 20 FCC Rcd. 3788 (2005) ................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*2012 TCPA Order*:
Report & Order, *Rules & Regs. Implementing the Tel. Cons.
Prot. Act of 1991,* 27 FCC Rcd. 1830 (2012) .............. 10, 19, 21, 22, 69

\* *ACA Declaratory Ruling*:
Declaratory Ruling, *Rules & Regs. Implementing the Tel. Cons.
Prot. Act of 1991; Request of ACA Int'l for Clarification &
Declaratory Ruling*, 23 FCC Rcd. 559 (2008) ....................... 11, 14, 15,
....................................................................................... 36, 44, 47, 49

*Public Safety Answering Point Registry*:
Report & Order, *Implementation of the Middle Class Tax Relief
& Job Creation Act of 2012; Establishment of a Pub. Safety
Answering Point Registry*, 27 FCC Rcd. 13615 (2012) ...................... 50

*SoundBite Declaratory Ruling*:
Declaratory Ruling, *Rules & Regs. Implementing the Tel. Cons.
Prot. Act of 1991; SoundBite Commc'ns, Inc., Pet. for Expedited
Declaratory Ruling*, 27 FCC Rcd. 15391 (2012) ................................ 19

*Telemarketing Sales Rule*,
67 Fed. Reg. 4492 (Jan. 30, 2002) ....................................... 49

**Statutes And Regulations:**

5 U.S.C. § 706(2) ..................................................................... 23

28 U.S.C. § 2342(1) .............................................................. 8, 37

28 U.S.C. § 2344 .................................................................. 8, 37

Health Insurance Portability and Accountability Act of 1996
(HIPAA), 42 U.S.C. §§ 1320 *et seq.* ....................... 21, 22, 68, 70, 71, 72

47 U.S.C. § 154(i) ................................................................... 11

47 U.S.C. § 201(b) .................................................................. 11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

\* Telephone Consumer Protection Act of 1991 (TCPA),
   Pub. L. No. 102-243, 105 Stat. 2394,
   *codified as amended at* 47 U.S.C. § 227 .................. 1, 2, 11, 46, 56, 75

§ 2 ....................................................................... 2, 45, 46, 56, 75

§ 3(c)(1) .......................................................................................... 11

47 U.S.C. § 227(a)(1) ........................................ 6, 10, 15, 27, 38, 39, 43

47 U.S.C. § 227(a)(1)(A) ......................................................... 38, 53

47 U.S.C. § 227(a)(1)(B) ................................................................ 53

47 U.S.C. § 227(b)(1)(A) ................................................ 6, 17, 70, 71

47 U.S.C. § 227(b)(1)(A)(i)-(ii) ..................................................... 10

47 U.S.C. § 227(b)(1)(A)(iii) ........................................... 10, 48, 56

47 U.S.C. § 227(b)(1)(B) ............................... 6, 9, 17, 21, 70, 71

47 U.S.C. § 227(b)(1)(C) ................................................. 9, 22, 71

47 U.S.C. § 227(b)(1)(C)(i) .......................................................... 46

47 U.S.C. § 227(b)(2) .................................................................... 11

47 U.S.C. § 227(b)(2)(B) ......................................................... 11, 70

47 U.S.C. § 227(b)(2)(B)(ii)(II) ................................................... 69

47 U.S.C. § 227(b)(2)(C) ............................... 11, 48, 56, 70, 71

47 U.S.C. § 227(b)(3) .................................................................... 11

47 U.S.C. § 227 Note ..................................................................... 2

47 U.S.C. § 402(a) ................................................................... 8, 37

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

47 U.S.C. § 405(a) ................................................................ 71

47 U.S.C. §§ 501-503 ........................................................... 11

Bipartisan Budget Act of 2015,
    Pub. L. No. 114-74, 129 Stat. 584 (2015) ............................ 51

Middle Class Tax Relief and Job Creation Act of 2012,
    Pub. L. No. 112-96, 126 Stat. 156 (2012) ............................ 50

16 C.F.R. § 310.4(b)(1)(v)(B)(ii)(A)-(B) ................................ 19

47 C.F.R. § 1.4(b)(2) ............................................................. 8

47 C.F.R. § 64.1200:

    47 C.F.R. § 64.1200(a)(1) ................................................ 68

    47 C.F.R. § 64.1200(a)(2) ........................................... 10, 68

    47 C.F.R. § 64.1200(a)(3) ............................................. 9, 10

    47 C.F.R. § 64.1200(a)(3)(v) ...................................... 21, 68

    47 C.F.R. § 64.1200(a)(7)(i)(B) ....................................... 19

    47 C.F.R. § 64.1200(b)(3) ................................................ 19

    47 C.F.R. § 64.1200(f)(2) ................................................. 12

    47 C.F.R. § 64.1200(f)(8) ................................................. 10

## Other Authorities:

137 Cong. Rec. S18321 (Nov. 26, 1991) ................................ 14

*American Heritage Dictionary of the English Language* (4th ed.
    2001) ................................................................................ 28

## TABLE OF AUTHORITIES
### (continued)

                                                                **Page(s)**

H.R. 1589 (102d Cong. 1991).................................................................30

H.R. 2131 (101st Cong. 1989)..............................................................45

H.R. 3035 (112th Cong. 2011) ........................................................30, 50

Jay Mallin, *Congress Tries to Shield Public from Deluge of
    Telemarketing*, Wash. Times, July 25, 1991 ......................................14

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ......................28

\* S. Rep. No. 102-178 (1991) ......................................... 2, 46, 66, 75

S. Subcomm. on Commc'ns, 102d Cong., S. H'rg No. 102-960,
    *S. 1462—The Automated Telephone Consumer Protection Act of
    1991, S. 1410—The Telephone Advertising Consumer Protection
    Act, and S. 857—Equal Billing for Long Distance Charges* (July
    24, 1991) ..........................................................................................14

Christopher J. Walker, *Avoiding Normative Canons in the Review
    of Administrative Interpretations of Law*,
    64 Admin. L. Rev. 139 (2012) ............................................................73

*Webster's New World College Dictionary* (5th ed. 2014).........................28

*Webster's Third New International Dictionary* (2002)...........................28

# GLOSSARY

| | |
|---|---|
| ***Omnibus Ruling*** or ***Order*** | Declaratory Ruling & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-281) |
| **FCC** or **Commission** | Federal Communications Commission |
| **FTC** | Federal Trade Commission |
| **Pet. Br.** | Joint Brief for Petitioners ACA Int'l *et al.* |
| **Rite Aid Br.** | Brief for Petitioner Rite Aid Hdqtrs. Corp. |
| **Intervenor Br.** | Joint Brief for Intervenors |
| **TCPA** | Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394, *codified as amended at* 47 U.S.C. § 227 |
| **Prerecorded Calls** | Calls made using an artificial or prerecorded voice, as regulated by 47 U.S.C. § 227(b)(1)(A) and (B) |
| **Autodialer** or **ATDS** | Automatic telephone dialing system, defined as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers" (47 U.S.C. § 227(a)(1)) |
| **Autodialed Calls** | Calls made using an autodialer, as regulated by 47 U.S.C. § 227(b)(1)(A) |
| **HIPAA** | Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320 *et seq.* |

**GLOSSARY**
**(continued)**

| | |
|---|---|
| ***1992 TCPA Order*** | Report & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 7 FCC Rcd. 8752 (1992) |
| ***2003 TCPA Order*** | Report & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 18 FCC Rcd. 14014 (2003) |
| ***2004 TCPA Order*** | Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 19 FCC Rcd. 19215 (2004) |
| ***2005 TCPA Order*** | Second Order on Reconsideration, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 20 FCC Rcd. 3788 (2005) |
| ***2012 TCPA Order*** | Report & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 27 FCC Rcd. 1830 (2012) |
| ***ACA Declaratory Ruling*** | Declaratory Ruling, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991; Request of ACA Int'l for Clarification & Declaratory Ruling*, 23 FCC Rcd. 559 (2008) |
| ***SoundBite Declaratory Ruling*** | Declaratory Ruling, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991; SoundBite Commc'ns, Inc., Pet. for Expedited Declaratory Ruling*, 27 FCC Rcd. 15391 (2012) |
| ***Public Safety Answering Point Registry*** | Report & Order, *Implementation of the Middle Class Tax Relief & Job Creation Act of 2012; Establishment of a Public Safety Answering Point Do-Not-Call Registry*, 27 FCC Rcd. 13615 (2012) |

No. 15-1211 (and consolidated cases)

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ACA INTERNATIONAL, *et al.*,

*Petitioners*,

CAVALRY PORTFOLIO SERVICES, LLC, *et al.*,

*Intervenors for Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petitions for Review of an Order of
the Federal Communications Commission

---

## BRIEF FOR RESPONDENTS

---

## INTRODUCTION

Seeking to protect consumers against a growing flood of invasive and unwanted telemarketing calls, Congress enacted the Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394, *codified as amended at* 47 U.S.C. § 227, to "ban all computerized calls to the home"—including "all autodialed calls * * * [to] cellular phones"— "unless the called party consents to receiving them, or unless the calls are

made for emergency purposes." S. Rep. No. 102-178, at 6 (1991); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 742 (2012) (the TCPA restricts "computerized calls to private homes" and other "abuses of telephone technology"). Based on an extensive legislative record, Congress found that consumers "consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy," and that "[b]anning such automated or prerecorded calls * * * except when the receiving party consents to receiving the call * * * is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." TCPA § 2(10), (12), 105 Stat. at 2394-95, *reprinted at* 47 U.S.C. § 227 Note. The TCPA does not prevent callers from making automated calls; it simply requires them to obtain the consent of the consumers they are calling.

The problems Congress identified have grown only worse in recent years as the use of automated calls has exploded. When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. TCPA § 2(3), 105 Stat. at 2394. By 2003, telemarketers were calling 104 million Americans every day, abetted by the proliferation of new and more powerful autodialing technology. *2003*

*TCPA Order*, 18 FCC Rcd. 14014, ¶¶ 2, 8. And despite the establishment of a national do-not-call list and other efforts to cut back on intrusive telemarketing, unwanted calls consistently remain a top consumer complaint today. *Order* ¶ 5 (JA1152).

Unwanted calls are especially problematic when made to mobile phones, which are now ubiquitous. "People keep their cellular phones on their person at nearly all times: in pockets, purses, and attached to belts." *Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831, 842 (Ariz. Ct. App. 2005). Calls to mobile phones not only invade the sanctity of the home, like calls to residential phones, but can literally reach into our pockets and pocketbooks and interrupt us at any moment of our lives—at home or at work; while walking or driving; when away on vacation; while in church or other private spaces; and during moments of quiet contemplation. And while "[a]n automated call to a landline phone can be an annoyance; an automated call to a cell phone adds expense to annoyance." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012) (Easterbrook, C.J.).

To be sure, some consumers may choose to receive certain automated calls by giving their consent, and they may choose to receive certain other notifications on their mobile phones by downloading various smartphone

- 3 -

applications.  But the fact that consumers might affirmatively opt in to receive certain messages does not give telemarketers license to make other, *unwanted* calls without the consumers' consent.

In the *Omnibus Ruling* under review, the Federal Communications Commission resolved nearly two dozen requests for declaratory rulings and reaffirmed that the TCPA protects consumers' right to choose which automated calls they wish to receive.  Declaratory Ruling & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-281) (*Omnibus Ruling* or *Order*).  This case involves challenges to four of the Commission's rulings:

- Consistent with the text of the statute, the Commission ruled that the TCPA's autodialer restrictions apply to any device with the *capacity* to autodial telephone numbers, even when the device is not being used in this manner, and that the term "capacity" can encompass both present and potential abilities.

- The Commission ruled that new consent is required to make automated calls to a wireless number after it has been reassigned to a new subscriber.  Thus, except for a one-call safe harbor, callers cannot continue to rely on the consent of the previous subscriber.

- 4 -

- The Commission ruled that consumers who previously agreed to receive automated calls may later revoke their consent by any reasonable means, and that callers should not be allowed to unilaterally restrict consumers' ability to revoke consent by designating their own exclusive revocation procedures and refusing to honor other reasonable requests to stop calling.

- The Commission exempted certain healthcare-related calls to wireless numbers that are made for purposes of healthcare treatment—including prescription notifications, exam confirmations, and pre-operative instructions—but declined to exempt calls made for other purposes, such as telemarketing, advertising, billing, or debt collection.

Because the Commission's resolution of each of these issues was a reasonable exercise of its delegated authority to interpret and administer the TCPA, the petitions for review should be denied.[1]

---

[1] This brief uses "Petitioners" to refer to the petitioners on the Joint Brief for Petitioners ACA International *et al.*, and "Rite Aid" to refer to petitioner Rite Aid Hdqtrs. Corp.

## STATEMENT OF THE ISSUES

**1.**    The TCPA defines an autodialer (or "automatic telephone dialing system") as any "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers."  47 U.S.C. § 227(a)(1).  Petitioners raise two issues:

**a.**    Whether it was permissible for the Commission to conclude in the *Omnibus Ruling* that the term "capacity" is not limited to a device's *present* capacity or abilities—a limitation that appears nowhere in the text of the statute—but can also encompass certain potential abilities.

**b.**    Whether the Commission's treatment of devices that call numbers from a stored list or database is properly before the Court, and if so, whether the Commission's past orders treating these devices as autodialers were reasonable and consistent with the statute.

**2.**    The TCPA generally forbids making automated calls to consumers without the "consent of the called party."  47 U.S.C. § 227(b)(1)(A), (B). In narrow circumstances, such as when a wireless number has been reassigned to a new subscriber, a caller who dials a number in an attempt to reach a consenting consumer may instead call a person who did not consent.  Petitioners challenge the Commission's rulings on two issues:

**a.** Whether it was permissible for the Commission to interpret the term "consent of the called party" to refer to the consent of the current subscriber (or current customary user) of the number—that is, the party whose number was actually called.

**b.** Whether it was reasonable for the Commission, recognizing that callers might not realize that a wireless number has been reassigned until after calling the number and failing to reach the intended recipient, to balance the interests of callers and consumers by allowing a limited one-call safe harbor for calls to reassigned numbers.

**3.** Whether it was reasonable for the Commission to rule that consumers may revoke consent by any reasonable means and that callers may not control consumers' ability to revoke consent by unilaterally designating their own exclusive revocation procedures.

**4.** Whether it was reasonable for the Commission to exempt healthcare-related calls to wireless numbers only when those calls serve a healthcare-treatment purpose, and not when the calls instead serve non-treatment purposes such as telemarketing, advertising, billing, or debt collection.

## JURISDICTIONAL STATEMENT

The *Omnibus Ruling* was released on July 10, 2015. Declaratory Ruling & Order, *Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) (JA1144-281). Each petitioner filed a timely petition for review within 60 days of the release of the order. *See* 28 U.S.C. § 2344; 47 C.F.R. § 1.4(b)(2). To the extent the petitions seek review of rulings made in the *Omnibus Ruling*, the Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The Court lacks jurisdiction, however, over the Commission's statements summarizing its past disposition of issues addressed in prior orders that the Commission did not reconsider or reopen here. *See infra* pp. 36-38.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

**1.**    The TCPA "empower[s] consumers to decide which robocalls and text messages they receive, with heightened protection to wireless consumers, for whom robocalls can be costly and particularly intrusive." *Order* ¶ 1 (JA1147). The statute establishes separate restrictions for calls

made to residential (landline) numbers and for calls made to wireless and emergency-service numbers.[2]

For residential numbers, the TCPA prohibits certain calls "using an artificial or prerecorded voice"—referred to here as prerecorded calls—"to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission." 47 U.S.C. § 227(b)(1)(B). Under current regulations, this provision applies only to calls that "include[] or introduce[] an advertisement or constitute telemarketing" and exempts non-commercial calls, calls made by or on behalf of a tax-exempt nonprofit corporation, and certain healthcare calls. *See* 47 C.F.R. § 64.1200(a)(3).

For wireless numbers, the TCPA prohibits "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice"—collectively referred to as automated calls—"to any telephone number assigned to a * * * cellular telephone service" or similar wireless service, other than calls made to collect a

---

[2]    The TCPA also regulates faxes, *see* 47 U.S.C. § 227(b)(1)(C), which are subject to a different regulatory scheme not relevant here.

government debt or calls exempted by the Commission.    47 U.S.C. § 227(b)(1)(A)(iii).  An "automatic telephone dialing system," or autodialer, "means equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers."  *Id.* § 227(a)(1).

Related provisions of the TCPA prohibit autodialed and prerecorded calls to emergency-service numbers, such as 911, and to certain healthcare facilities.  47 U.S.C. § 227(b)(1)(A)(i)-(ii).  The restrictions on automated calls to wireless and emergency-service numbers apply to text messages as well as voice calls.  *Order* n.3 (JA1147); *see 2003 TCPA Order* ¶ 165; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009).

The form of consent required varies depending on the type of call. For calls "that include[] or introduce[] an advertisement or constitute[] telemarketing," consent must be "prior express written consent" that meets specific requirements.  47 C.F.R. § 64.1200(a)(2), (a)(3), (f)(8); *see 2012 TCPA Order*, 27 FCC Rcd. 1830, ¶¶ 20-26, 32-34.  For calls that do not contain advertisements or telemarketing, sometimes referred to as "informational" calls, consent may be oral, written, or demonstrated by a consumer's actions in particular circumstances.  *Id.* ¶¶ 27-30.  For these informational calls, "[p]ersons who knowingly release their phone numbers

have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *Order* ¶ 49 (JA1173) (quoting *1992 TCPA Order*, 7 FCC Rcd. 8752, ¶ 31); *see also ACA Declaratory Ruling*, 23 FCC Rcd. 559, ¶¶ 9-11 (2008).

**2.**  Congress gave the FCC broad authority to interpret and administer the TCPA.  In addition to the Commission's general authority to "make such rules and regulations[] and issue such orders" as necessary to carry out its functions, 47 U.S.C. § 154(i), and its authority to "prescribe such rules and regulations as may be necessary in the public interest" to regulate use of the telephone network as common carriage, *id.* § 201(b), Congress specifically directed the Commission to "prescribe regulations to implement" the restrictions on autodialed and prerecorded calls, *id.* § 227(b)(2); *see also* TCPA § 3(c)(1), 105 Stat. at 2402.

The FCC is empowered under 47 U.S.C. §§ 501-503 to bring enforcement actions for any violations of the TCPA.  The TCPA also allows consumers to enforce the restrictions on autodialed and prerecorded calls through a private right of action.  *Id.* § 227(b)(3).  At the same time, the TCPA authorizes the FCC to exempt certain calls from the Act's restrictions on calls to residential numbers, *see id.* § 227(b)(2)(B), and on calls to wireless numbers, *see id.* § 227(b)(2)(C), subject to certain conditions.

### B.    Issues Relevant To This Appeal

The petitions for review of the *Omnibus Ruling* challenge the Commission's treatment of four principal issues.

#### 1.    Autodialers

**a.** In its initial rulemaking to implement the TCPA, the Commission adopted a definition of autodialer that simply reiterates the statutory language: "The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers." 47 C.F.R. § 64.1200(f)(2); *see 1992 TCPA Order* ¶ 6 & app. B. The Commission "decline[d] to adopt definitions offered by commenters where such definitions fit only a narrow set of circumstances, in favor of broad definitions which best reflect legislative intent by accommodating the full range of telephone services and telemarketing practices." *1992 TCPA Order* ¶ 6.

In a 2003 rulemaking, the FCC addressed whether a type of dialing device known as a predictive dialer—"an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers [from a stored list or database] in a manner that 'predicts' the time when a consumer will answer the phone and a

telemarketer will be available to take the call"—qualifies as an autodialer under the TCPA. *See 2003 TCPA Order* ¶¶ 8 & n.31, 129-133. The Commission recognized that, "through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers." *Id.* ¶ 133. "It is clear," moreover, "that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies," and that the statute was written "to ensure that the prohibition on autodialed calls not be circumvented." *Id.* ¶¶ 132-133.

Although predictive dialers are more advanced than earlier autodialers, "[t]he basic function of such equipment * * * has not changed— the capacity to dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." *Ibid.* (emphasis omitted). "Therefore," the Commission ruled, "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *Id.* ¶ 133.[3]

---

[3]    Although predictive dialers were not yet in widespread use in 1991, the legislative record shows that Congress was aware of this nascent technology and concerned about the dangers it posed. *See, e.g.*, S. Subcomm. on Commc'ns, 102d Cong., S. H'rg No. 102-960, *S. 1462— The Automated Telephone Consumer Protection Act of 1991, S. 1410—*

In 2005, the Commission denied several petitions asking it to
reconsider the *2003 TCPA Order*'s treatment of predictive dialers. *2005
TCPA Order*, 20 FCC Rcd. 3788, ¶¶ 32-34. No party petitioned for review
of the Commission's approach to autodialers following the *2003 TCPA
Order* or the order denying reconsideration.[4]

Later that year, ACA International asked the Commission to clarify
whether the TCPA's autodialer restrictions apply to predictive dialers
when used by debt collectors. *See* ACA Int'l 2005 Pet. (JA94-118). The
Commission responded in 2008 by "affirm[ing]" its conclusion that "a
predictive dialer constitutes an [autodialer] and is subject to the TCPA's
restrictions."[5] *ACA Declaratory Ruling* ¶ 12. Although predictive dialers

---

*The Telephone Advertising Consumer Protection Act, and S. 857—
Equal Billing for Long Distance Charges* 16, 19, 25 (July 24, 1991); 137
Cong. Rec. S18321 (Nov. 26, 1991) (quoting Jay Mallin, *Congress Tries
to Shield Public from Deluge of Telemarketing*, Wash. Times, July 25,
1991) (identifying these devices as "predictive autodialers").

[4] Some parties did seek review of other, unrelated aspects of the *2003
TCPA Order*. *See Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228
(10th Cir. 2004).

[5] The *ACA Declaratory Ruling* superseded past statements suggesting
that debt-collection calls fell outside the autodialer restrictions.
*Compare* ACA Int'l 2005 Pet. 9 (JA103) (asking the Commission to
resolve an alleged inconsistency between the *2003 TCPA Order* and
past orders) *with ACA Declaratory Ruling* ¶¶ 12-14 (resolving any
inconsistency by ruling that debt-collection calls made using predictive
dialers are subject to the autodialer restrictions).

may be more sophisticated than earlier autodialers, the Commission reiterated that "the basic function of such dialing equipment[] ha[s] not changed." *Id.* ¶ 13. Neither ACA International nor anyone else petitioned for review of that ruling.

In this proceeding, various parties—including ACA International, *see* ACA Int'l 2014 Pet. 6-9 (JA415-18)—asked the FCC to consider this issue yet again. In the *Omnibus Ruling*, the Commission did not reopen or revisit its earlier conclusion that predictive dialers are autodialers. Instead, the Commission referred parties to the *2003 TCPA Order* and the *ACA Declaratory Ruling*, which it summarized in a few sentences. *See Order* ¶¶ 13-14 (JA1156).

**b.** The *Omnibus Ruling* did rule on a separate issue concerning autodialers. The TCPA defines an autodialer as any equipment "which has the capacity" to autodial numbers. 47 U.S.C. § 227(a)(1). Several petitions asked the Commission to rule that the term "capacity" must be limited to a device's "present ability" or "current capacity," and does not encompass other "potential abilities," even though Congress did not specifically impose that limitation. *See Order* ¶ 11 (JA1155).

The Commission declined to adopt such a limitation, reasoning that ordinary definitions of "capacity" include potential abilities and that

- 15 -

limiting the statutory definition of an autodialer would undermine enforcement of the TCPA's privacy protections. *Order* ¶ 19 (JA1158-59); *see id.* ¶¶ 11-22 (JA1155-60). In the Commission's view, the term "capacity" can encompass certain potential capacity or abilities, so long as those abilities are not "too attenuated" or "theoretical." *Id.* ¶ 18 (JA1158).

### 2.    Reassigned Wireless Numbers

The *Omnibus Ruling* also addressed whether a caller may rely on the consent of a former subscriber to a wireless number after that number is reassigned to a new subscriber, and if not, whether the caller is immediately liable if it inadvertently makes an automated call to the new subscriber. *See Order* ¶¶ 71-93 (JA1182-94).

In the early 2000s, the FCC faced a similar question concerning how the statute applies when a phone number is "ported" from landline to wireless service, triggering additional restrictions on callers. *See 2003 TCPA Order* ¶¶ 168-172. In response, the Commission declined "to create a good faith exception for inadvertent autodialed or prerecorded calls to" these numbers. *Id.* ¶ 172. It instead directed the telemarketing industry to develop and rely on marketplace solutions to identify wireless numbers. *Id.* ¶¶ 169-170. This problem was soon solved by a private company, Neustar, which developed a commercial service that callers can use to

detect ported numbers. *2004 TCPA Order*, 19 FCC Rcd. 19215, ¶¶ 7, 10; *see* https://www.tcpacompliance.us/.

In this proceeding, the Commission was asked to address how the TCPA's "consent of the called party" requirement, 47 U.S.C. § 227(b)(1)(A), (B), applies when a caller obtains consent to make automated calls to a consumer's wireless number, but that number is later reassigned to a new subscriber who has not consented. Several parties asked the Commission to rule that callers need only have consent from the "intended recipient" of the call, rather than the person actually called. *See Order* ¶ 78 (JA1185-86).

The Commission concluded that the "called party" whose consent is required refers to the current subscriber (or current customary user) of the telephone number—that is, the party whose number was actually called. *Order* ¶¶ 73-75 (JA1183-85). That conclusion comports with other provisions of the statute, which discuss whether the "called party" is charged for a call, implying that "called party" means the current subscriber (or someone connected to them). *Id.* ¶ 74 (JA1184). And the Commission "agree[d] with the Seventh and Eleventh [C]ircuits that the TCPA nowhere indicates that caller intent is relevant to the definition of 'called party.'" *Id.* ¶ 78 (JA1185-86) (citing *Soppet*, 679 F.3d 637, and *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014)).

- 17 -

The Commission acknowledged that, at present, it is not always possible for callers to discover all reassignments immediately after they occur. *Order* ¶¶ 85, 88 (JA1189, 1192). There are, however, "a number of options available" that "may permit [callers] to learn of reassigned numbers," including a database from Neustar that already "claim[s] to include 80 percent of wireless [numbers]" and to "verify that the phone number still belongs to the individual who gave consent." *Id.* ¶ 86 & n.301 (JA1190); *accord* Neustar Slides 30 (JA347) (claiming to "cover[] about ~95% of the mobile phone market"); *see also Order* ¶ 86 & nn.303-304 (JA1191) (discussing other steps callers can take to learn of reassignments).

Seeking to strike "an appropriate balance" between the interests of callers and consumers, the *Omnibus Ruling* allowed a one-call safe harbor for calls to reassigned wireless numbers when the caller has consent from the previous subscriber and is not aware of the reassignment. *Order* ¶¶ 85, 89-90 & n.312 (JA1190, 1192-93). This one-call window will often, though not always, allow the caller to learn of the reassignment—for example, by speaking with the new subscriber or hearing a new voicemail prompt. While this limited safe harbor will not always yield actual notice of every reassignment, the Commission determined that "[o]ne call represents an appropriate balance between a caller's opportunity to learn

of the reassignment and the privacy interests of the new subscriber to avoid a potentially large number of calls to which he or she never consented." *Id.* ¶ 90 & n.312 (JA1192).

### 3. Revoking Consent

The *Omnibus Ruling* also addressed whether and how a consumer who has previously given consent to receive automated calls may later revoke that consent.

Both the FCC and the FTC have long implicitly recognized a right to revoke consent by requiring prerecorded telemarketing calls to provide an opt-out mechanism that is announced at the start of the call. *Order* ¶ 64 (JA1179) (citing 47 C.F.R. § 64.1200(a)(7)(i)(B), (b)(3)); 16 C.F.R. § 310.4(b)(1)(v)(B)(ii)(A)-(B); *see 2012 TCPA Order* ¶¶ 44-49. And in a 2012 declaratory ruling, the Commission repeatedly indicated that consumers can opt out of future messages. *SoundBite Declaratory Ruling*, 27 FCC Rcd. 15391 (2012); *see Order* ¶ 57 (JA1177).

In the *Omnibus Ruling*, the FCC reaffirmed that consumers who have consented to receive automated calls have the right to later revoke their consent. *Order* ¶¶ 56-58 (JA1176-77). The Commission "agree[d] with the Third Circuit that, 'in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of

- 19 -

consumers,'" because this approach "gives consent its most appropriate meaning within the consumer-protection goals of the TCPA." *Id.* ¶ 56 (JA1176-77) (quoting *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013)).  The Commission further observed that allowing consumers to revoke consent is consistent with common-law principles.  *Id.* ¶ 58 (JA1177).  "By contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent." *Id.* ¶ 56 (JA1177).

The Commission then ruled that "callers may not control consumers' ability to revoke consent" and "may not infringe on that ability by designating an exclusive means to revoke." *Order* ¶ 63 (JA1179).  As the Commission explained, "allow[ing] callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair" consumers' right to revoke consent.  *Id.* ¶ 66 (JA1180).  And it would make little sense to allow "a caller * * * with actual knowledge that a consumer has [attempted to] revoke[] previously-given consent * * * to robocall [the] consumer without facing TCPA liability, despite the consumer's repeated reasonable attempts to revoke consent." *Id.* ¶ 67 (JA1180).

Consumers are instead free to revoke consent "using any reasonable method[,] including orally or in writing." *Order* ¶ 64 (JA1179). Reasonable revocation has two components. First, the consumer must "clearly express[] a desire not to receive future messages." *Id.* ¶ 63 (JA1179). Second, the method of communicating that desire must be "reasonable"—that is, it must be communicated in such a way that "callers typically will not find it overly burdensome to implement mechanisms to record and effectuate [the] consumer's request." *Id.* ¶ 64 (JA1179). Under this standard, consumers "generally may revoke" their prior consent "by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location." *Ibid.*

### 4. Exemptions For Certain Healthcare Calls

Finally, the *Omnibus Ruling* addressed the treatment of certain healthcare calls to wireless numbers.

In 2012, the Commission exercised its authority under 47 U.S.C. § 227(b)(1)(B) to exempt healthcare calls covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. §§ 1320 *et seq.*, from the TCPA's restrictions on calls to residential numbers. *2012 TCPA Order* ¶¶ 57-65; *see* 47 C.F.R. § 64.1200(a)(3)(v). The Commission explained that when "the calls at issue * * * are intended to communicate

health care-related information rather than to offer property, goods, or services," they "do not tread heavily upon * * * consumer privacy interests" so long as they "are placed by the consumer's health care provider to the consumer and concern the consumer's health." *2012 TCPA Order* ¶ 63.

In the *Omnibus Ruling*, the Commission exercised its separate authority under 47 U.S.C. § 227(b)(1)(C) to exempt certain HIPAA-covered healthcare calls from the TCPA's restrictions on calls to wireless numbers. *Order* ¶¶ 143-148 (JA1213-15). The Commission exempted "calls for which there is exigency and that have a healthcare treatment purpose," including prescription notifications, exam confirmations, and pre-operative instructions. *Id.* ¶ 146 (JA1214). It declined, however, to exempt calls "that include telemarketing, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content," because "[t]imely delivery of these types of messages is not critical to a called party's healthcare, and they therefore do not justify setting aside a consumer's privacy interests" for calls to wireless numbers. *Ibid.*

## STANDARD OF REVIEW

An agency's construction of the statutes it administers is governed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, "if the statute is silent or ambiguous with respect

to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If so, the Court must "accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X*, 545 U.S. 967, 980 (2005).

Agency deference under *Chevron* "is rooted in a background presumption" that Congress "knows to speak in plain terms when it wishes to circumscribe * * * agency discretion." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). Even when a statute "speak[s] directly to the precise question at issue," it does not foreclose agency discretion unless Congress "unambiguously express[es] its intent through its choice of statutory language." *Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 980 (1986).

A court may not overturn agency action unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2). "Under this highly deferential standard of review," courts must "presume[] the validity of agency action and must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93 (D.C. Cir. 2004) (citations omitted).

- 23 -

## SUMMARY OF THE ARGUMENT

**I.**   The FCC's treatment of autodialers is reasonable and consistent with the statutory text.

**A.**   The Commission permissibly ruled that the term "capacity" is not strictly limited to a device's *present* capacity and can also include potential capacity or abilities.  Dictionary definitions, ordinary usage, and principles of statutory interpretation all agree that "capacity" can include potential abilities.  By contrast, petitioners' proposed distinction between "present" and "potential" capacities is unclear and unworkable.  The Commission properly recognized that the focus should instead be on whether a given ability is "too attenuated" or "theoretical."

**B.**   The Commission's treatment of devices that call numbers from a stored list or database, such as predictive dialers, is not properly before the Court, because that issue was addressed in past rulings that the Commission did not reconsider or reopen here.  In any event, Petitioners' contention that these devices are exempt from the autodialer restrictions because they do not necessarily call random or consecutive telephone numbers misreads the statute, which does not unambiguously impose any such requirement.   Indeed, Petitioners offer no sensible reason why Congress would have sought to prohibit automated calls to lists of random

or consecutive numbers, but not to any other lists of numbers.  Even if the status of these devices were in doubt, Congress has ratified the Commission's approach through subsequent amendments to the statute.

**II.**  The Commission permissibly interpreted "consent of the called party" to refer to the consent of the current subscriber (or current customary user) of a telephone number—that is, the party whose number was actually called.  Nothing in the statute supports Petitioners' view that the identity of the "called party" should turn on the intent or expectations of the caller.  And although the Commission could have stopped there, its independent decision to allow a one-call safe harbor is a reasonable measure to balance the interests of callers and consumers.

**III.** Petitioners do not dispute that the TCPA permits consumers to revoke their prior consent; they challenge only *how* consumers may do so.  Because the statute is silent on that issue, the Commission had broad authority to fill that statutory gap.  In view of the TCPA's consumer-protection goals, it was reasonable for the Commission to conclude that consumers should be able to revoke consent by any reasonable means and that callers should not be allowed to control consumers' ability to revoke consent.

**IV.** It was neither arbitrary nor capricious for the Commission to exempt healthcare-related calls to wireless numbers only when those calls serve a healthcare-treatment purpose.  Nor was it unreasonable for the Commission to grant any narrower exemption for calls to wireless numbers than for calls to residential numbers; the statute itself treats these calls differently.

## ARGUMENT

### I.    THE COMMISSION'S TREATMENT OF AUTODIALERS IS REASONABLE AND CONSISTENT WITH THE STATUTORY TEXT.

Contrary to Petitioners' broad portrayal, the *Omnibus Ruling* does not purport to define what constitutes an autodialer, much less to alter the statutory definition.  In fact, the *Omnibus Ruling* specifically declined to "address the exact contours of the 'autodialer' definition" or "to determine comprehensively each type of equipment that falls within that definition." *Order* ¶ 17 (JA1156-57).  Instead, with respect to autodialers, the Commission narrowly addressed a discrete issue: whether the autodialer restrictions must be limited to devices that have the "*present* capacity" to autodial telephone numbers, even though the text of the statute is not so limited.  The Commission's ruling on that issue is reasonable and consistent with the statutory text.

- 26 -

## A.    The Commission's Ruling That "Capacity" Need Not Be Limited To "Present Capacity" Is Reasonable And Consistent With The Statutory Text.

The Commission reasonably denied Petitioners' request to limit the TCPA's autodialer restrictions to devices that have the "current capacity" or "present ability" to autodial telephone numbers at the time a call is made. *See Order* ¶¶ 11-22 (JA1155-60).  Congress nowhere imposed such a limitation in the statute, and adopting Petitioners' proposed limitation would undermine enforcement of the TCPA's consumer-privacy protections.

1.    Petitioners have failed to demonstrate that the text of the statute unambiguously limits the autodialer restrictions to devices with the "present" capacity to autodial numbers at the time a call is made.

The "principal problem" with Petitioners' position is that it would require the Court to add a word that "do[es] not appear in the statute." *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (2008).  The TCPA defines an autodialer to include any "equipment which has the capacity" to autodial telephone numbers—not merely the *present* capacity. 47 U.S.C. § 227(a)(1).  That Petitioners' preferred interpretation would "'add[] words that are not in the statute that the legislature enacted' * * * creates strong doubts about whether [their] interpretation is correct, let

- 27 -

alone unambiguously clear." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 700 (D.C. Cir. 2014); *see also Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008) ("Congress enacted the ambiguous 'valid existing rights' instead of the more precise 'valid existing property rights,'" thereby "delegat[ing] policymaking authority [to an agency] through ambiguity.").

Dictionary definitions of "capacity" readily encompass both present *and potential* capacity. *Order* ¶ 19 & n.70 (JA1158); *see*, *e.g.*, *American Heritage Dictionary of the English Language* (4th ed. 2001) ("potential for growth, development, or accomplishment"); *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("potential or suitability for holding, storing, or accommodating"); *Webster's New World College Dictionary* (5th ed. 2014) ("the quality of being adapted * * * or susceptible * * *; potentiality"); *Webster's Third New International Dictionary* (2002) ("potentiality for production or use"). And when there are "alternative dictionary definitions of the word" used in a statute, the agency charged with administering the statute may permissibly choose between them. *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 418 (1992); *accord Brand X*, 545 U.S. at 1002.

Petitioners argue (Br. 23-24) that in order to reach potential ability, the statute would need to refer to equipment which "*could have* the capacity" to autodial numbers. As the dictionary definitions demonstrate, however, the word "capacity" *already* incorporates "a sense of futurity or unrealized potentiality" that encompasses potential abilities. *Order* n.70 (JA1158). There was thus no need for Congress to use a modifier or conditional tense (such as "could have") to address potential abilities; to the contrary, doing so would have been redundant and unidiomatic.

Petitioners' own hypotheticals (Br. 22) do not support their view that "capacity" unambiguously means *present* capacity. Consider these counterexamples:

- If I ask whether the Firefox browser has the "capacity" to play Flash videos, it would be natural for you to answer "Yes, if you download the Flash plug-in"—and it would be incorrect for you to answer "No."

- We would not say that a stadium's seating capacity rises and falls every time a person in a wheelchair enters and exits the stadium; a stadium has the "capacity" to seat people in spaces designated for wheelchairs even when no wheelchairs are present.

- If I own a factory that currently produces 1,000 widgets per week, but could produce 2,500 widgets per week if I were to hire additional workers to run the factory overnight and on weekends, then it would be fair to tell a prospective client that I have the "capacity" to produce 2,500 widgets per week—even though my *present* workforce can't do that.

"[W]here a statute's plain terms admit of two or more reasonable ordinary usages," as here, "the Commission's choice of one of them is entitled to deference." *Brand X*, 545 U.S. at 989.

Indeed, if Congress wanted to unambiguously address only devices with the *present* capacity to autodial numbers, there would have been no reason to use the word "capacity" at all. Congress could instead have used the present tense to regulate any "equipment *which stores or produces* numbers to be called * * * and *dials* such numbers"—an approach that was used in an alternative bill that Congress considered but rejected, *see* H.R. 1589, sec. 3, § 228(a)(1) (102d Cong. 1991) (considering "a device which automatically dials telephone numbers and plays a recorded message"), and in amendments to the autodialer definition that Congress rejected in 2011, *see* H.R. 3035, sec. 2(a)(1) (112th Cong. 2011). *Cf. In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1261 (S.D. Cal. 2012)

- 30 -

(under Petitioners' approach, "the phrase 'has the capacity' would have been superfluous").

**2.**    Petitioners' "present capacity" approach is also flawed as a matter of policy, because it would not be administrable and would "create problems for enforcing the TCPA's privacy protections."    *Order* ¶ 19 (JA1158-59).

Petitioners nowhere explain how to distinguish between so-called "present" abilities and mere "potential" abilities.  At times, they focus on whether a device would need to be "modified" to operate as an autodialer. *E.g.*, Br. 2, 22-23, 27-28.  But except when a device is *currently in use as* an autodialer, which cannot be the proper test (because the statute applies to equipment with the "capacity" to autodial numbers even when it is not being *used* in that manner), activating the autodialer functionality will always require some degree of "modification"—*e.g.*, shifting a switch from "manual" mode to "autodialer" mode; pressing a button to begin autodialing; selecting an option in a software configuration screen; downloading an autodialer plug-in from the manufacturer's website; replacing the manufacturer's software entirely; or attaching a mechanical dialing rig.  The differences between these examples are differences of degree, not of kind, frustrating Petitioners' attempt to draw any clear and

administrable line between "present" capacities and "potential" ones.  The Commission's approach, by contrast, takes this range of possibilities into account by focusing not on labels (which may prove illusory) but instead on whether the capacity is "too attenuated" or "theoretical" to regard a device as an autodialer.  *See Order* ¶ 18 (JA1158).

Petitioners' approach would also frustrate practical enforcement of the TCPA's privacy protections.  For example, many telemarketing devices allow autodialing functionality to be enabled and disabled by flipping a switch or by changing an option in software.   Consumers, however, generally cannot know precisely what equipment a caller was using and precisely which functionalities were "enabled" at the time they were called, and cannot be expected to allege these details when filing a complaint.  *Cf. Order* ¶ 19 (JA1158-59) (Petitioners' interpretation "could create problems for enforcing the TCPA's privacy protections with regard to proving how a system with multiple functions was actually used").  To plausibly allege the use of an autodialer, a consumer should only need to allege facts suggesting that the caller used equipment that has the potential capacity to autodial numbers, as most professional dialing equipment does, and need not detail the precise configuration of that equipment at the time the call was made.  *See*, *e.g.*, *In re Jiffy Lube*, 847 F. Supp. 2d at 1260 & n.8.

Callers should not be able to exploit pleading standards to erect hurdles that prevent consumers from enforcing their TCPA rights in situations where an autodialer was used.

**3.**    Reading "capacity" to encompass some potential abilities does not mean, as Petitioners allege, that the autodialer restrictions lack any limiting principle.  Rather, the Commission explained, there "must be more than a theoretical potential" that the equipment could operate as an autodialer, and the ability to do so must not be "too attenuated."  *Order* ¶ 18 (JA1158).  Thus, for example, neither the theoretical possibility of modifying a rotary phone nor the mere addition of a speed-dial button renders a device an autodialer.  *See ibid.*

Petitioners complain (Br. 35-36) that the Commission has not yet sought to comprehensively map the precise boundaries of what constitutes an autodialer under this test.  This Court has made clear, however, that agencies "need not deal in one fell swoop with the entire breadth of a novel development," and may instead proceed "'one step at a time,'" especially in complex fields characterized by rapid economic and technological change. *Nat'l Ass'n of Broad. v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)); *see also Brand X*, 545 U.S. at 1002 (endorsing FCC's discretion to proceed "incrementally").

It was both lawful and responsible for the Commission to articulate rough "outer limits" for what constitutes an autodialer, *Order* ¶ 18 (JA1158), and to proceed incrementally if and when further questions arise.

Petitioners are incorrect (Pet. Br. 37) that the Commission's ruling necessarily sweeps in devices such as ordinary smartphones. The Commission specifically declined to address the treatment of smartphones in this order, explaining that "there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology" and that no party identified "any scenarios under which unwanted calls are likely to result from consumers' typical use of smartphones." *Order* ¶ 21 (JA1159-60). Nothing in the *Omnibus Ruling* compels a conclusion that ordinary smartphones qualify as autodialers.

It was reasonable for the Commission not to address hypothetical questions about smartphones in this ruling. The Commission ordinarily does not issue declaratory rulings absent a petition specifically asking it to do so and setting forth all potentially relevant facts. No party filed a petition asking the FCC to rule on the status of smartphones, and no factual record was developed below describing the capabilities and limitations of smartphones in general or of any particular smartphone device. Smartphones may theoretically be able to perform any number of

- 34 -

functions by downloading some program or app, but the record does not address how attenuated those theoretical possibilities are. Nor has the Commission been presented with any "evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer." *Order* ¶ 21 (JA1160). And the Commission is particularly justified in taking an incremental approach when faced with complex and fast-evolving technology like today's smartphones, which did not even exist until a few years ago. *See Nat'l Ass'n of Broad.*, 740 F.2d at 1211 ("[A]n incremental approach" is "easily justified when an agency acts against a background of rapid technical and social change and when the agency's initial decision as a practical matter is reversible should the future proceedings yield drastically unexpected results.").

Any party concerned about the regulatory treatment of smartphones remains free to file a petition asking the Commission to address that issue. In the meantime, nothing in the *Omnibus Ruling* precludes any party from arguing, before the Commission or in court, that smartphones do not fit the statutory definition of an autodialer. *Cf. In re Jiffy Lube*, 847 F. Supp. 2d at 1262 ("Without further support * * * the court cannot conclude that use of personal electronic devices * * * would be restricted by the TCPA.").

- 35 -

The *Omnibus Ruling* does not resolve the regulatory status of smartphones.[6]

### B. The Commission's Treatment Of Devices That Call Stored Lists Of Numbers Is Not Properly Before The Court, But In Any Event Is Reasonable And Consistent With The Statutory Text.

Petitioners assert (Br. 32-33) that the *Omnibus Ruling* determined that devices used to "dial numbers from a prepared list" are autodialers and that this determination violates the TCPA. But the sentences to which Petitioners object simply quote and describe what the Commission decided in *past* orders, the *2003 TCPA Order* and the *ACA Declaratory Ruling*, addressing predictive dialers. The Commission did not reopen or grant reconsideration of those orders here—nor could it have done so,

---

[6] Petitioners' claim that the United States in two prior cases "agree[d]" with their position that "capacity refers to present, not potential capacity" (Br. 28-29) is incorrect and falsely misattributes a quotation. The opinion in *De Los Santos* does not mention any position taken or argument made by the United States, and nothing in the *Jiffy Lube* opinion supports the notion that the United States equated "capacity" with present ability. The United States' briefs in those cases simply said that it was unlikely that the TCPA would apply to ordinary smartphones as used by consumers; neither brief took any position on the meaning of "capacity" or used the language that Petitioners misattribute to it. *See* U.S. Mem. 8-11, *De Los Santos v. Millward Brown, Inc.*, No. 9:13-cv-080670 (S.D. Fla. filed Jan. 31, 2014); U.S. Mem. 8-10, *In re Jiffy Lube*, No. 3:11-MD-02261 (S.D. Cal. filed Dec. 27, 2011). The position taken by the United States in those briefs is entirely consistent with the FCC's *Omnibus Ruling* and with the position the United States takes in this brief.

because the agency cannot reconsider the result of its 2003 rulemaking in a declaratory ruling. *Order* ¶ 22 (JA1160); *see Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) (agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

As a result, the Court lacks jurisdiction to consider the Commission's treatment of devices that call a stored list of numbers, because that issue was resolved in past orders that were not timely appealed and were not reconsidered in the *Omnibus Ruling* under review in this case. *See* 28 U.S.C. §§ 2342(1), 2344; 47 U.S.C. § 402(a) ("Any proceeding to enjoin, set aside, annul, or suspend any order of" the FCC "shall be brought" in a petition for direct review of the challenged order); *see also ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 277, 278-81 (1987) (an agency's denial of a request for reconsideration that did not invoke new evidence or changed circumstances is "unreviewable"). "[F]or the court to examine the merits," Petitioners "must demonstrate that in the [order] the Commission reopened consideration of [its past rulings], for otherwise [their] challenge is untimely," *Biggerstaff v. FCC*, 511 F.3d 178, 185 (D.C. Cir. 2007), and "[t]he Commission's intention to initiate a reopening must be clear from the administrative record," *ibid.* (citing *Charter Commc'ns, Inc. v. FCC*, 460

F.3d 31, 38 (D.C. Cir. 2006)).  No such "clear" "intention" is present here.

Even if the FCC's past orders were properly before the Court, however, the Commission's statements that autodialers include devices that call a stored list or database of telephone numbers, without being limited to random or consecutive numbers, is reasonable and not foreclosed by the text of the statute.

### 1.    The FCC's Approach Is Consistent With The Statutory Text.

Petitioners' position appears to be that devices that call a stored list of telephone numbers cannot be autodialers under 47 U.S.C. § 227(a)(1) because these devices do not necessarily call "random or sequential" numbers.  But any device that can call a stored list of telephone numbers has the capacity to call random or sequential numbers, simply by using a list of random or sequential numbers as the calling list.  *See*, *e.g.*, *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014).  Such an autodialer need not itself be able to "produce" a list of random or sequential numbers, only to "store" them.  47 U.S.C. § 227(a)(1)(A); *Order* ¶ 111 (JA1201) (emphasizing "store *or* produce"); *2003 TCPA Order* ¶ 132 ("The statutory definition contemplates autodialing equipment that *either* stores *or* produces numbers.") (emphasis added).

Yet even setting aside the meaning of "capacity," Petitioners' premise that a device is an autodialer only if it is used to call *random or sequential telephone numbers* does not follow from the text of the statute. Section 227(a)(1) defines an autodialer as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." That definition does not specifically require that the underlying "telephone numbers to be called" consist of *random or sequential telephone numbers*, as Petitioners contend, even though Congress could easily have written the statute that way if it so intended, *cf.* Worsham Comments 5 (JA21), and in fact rejected a proposed amendment in 2011 that would have done just that, *see infra* Part I.B.3. Indeed, as a purely linguistic matter, the text of the statute *cannot* be read to require that the telephone numbers must be random or sequential numbers.

Petitioners proceed as if "random or sequential" modifies "telephone numbers," but that is incorrect. The "random or sequential" language in Section 227(a)(1) appears only in the phrase "using a random or sequential number generator"—and *that* phrase cannot be read to modify "telephone numbers," because numbers do not have the capacity to act or to "us[e]"

- 39 -

anything.  The phrase must instead modify one of the verbs describing what the "equipment" does.

Perhaps Petitioners believe that the telephone numbers must be "*store[d] or produce[d]* * * * using a random or sequential number generator."  But "using a random or sequential number generator" cannot modify "*store*," because it makes no sense to take a list of numbers produced elsewhere and "store [them] using a random or sequential number generator."  The act of *storing* numbers, unlike producing them, does not make use of a number generator at all.  As the Third Circuit recently observed, "it is unclear how a number can be *stored* (as opposed to *produced*) using a 'random or sequential number generator.'"  *Dominguez v. Yahoo, Inc.*, --- F. App'x ---, 2015 WL 6405811, at *3 n.1 (3d Cir. 2015).

This leaves two possible readings of the statute, neither of which helps Petitioners.  One possibility is that "using a random number generator" modifies only "produce," and not "store."  But in that case, an autodialer need only have "the capacity to store * * * telephone numbers to be called * * * and to dial such numbers," which by definition includes any device that calls a stored list or database of numbers.

The other possibility is that the "random or sequential" language describes the process in which the telephone numbers—which could be

random, sequential, or drawn from a stored list or database—are "to be *called*." But on that view, any device that can call lists of numbers easily fits the definition of a predictive dialer:  Given a list of numbers to be called, the dialer must proceed through them either randomly or in some sequence.  *See*, *e.g.*, *Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1220-23 (S.D. Fla. 2014) (device that "stores preprogrammed telephone numbers and then dials these numbers automatically in a sequential order from the preprogrammed list" is an autodialer); *Moore v. Dish Network LLC*, 57 F. Supp. 3d 639, 653-55 (N.D. W. Va. 2014) (device that "calls each record contained in the list in the order that they are delivered to the hardware" is an autodialer), *appeal dismissed*, No. 14-2245 (4th Cir. 2015).

Calling numbers in "sequen[ce]" is not limited to calling them in consecutive order.  Sequences need not all be consecutive, linear, or monotonic; those are *types* of sequences, not a defining characteristic of all sequences.  This is true even for the arbitrary-number dialers that Petitioners agree must be autodialers:  A device that calls all numbers of the form 555-*xxxx* by first calling all of the odd numbers, then calling all of the even numbers, would be calling all such numbers in a sequence, as would a device that calls all odd numbers while skipping all even

numbers (or other hopscotch variations); the TCPA cannot be evaded
through such simple tricks. Some autodialers may use more sophisticated
formulas or algorithms to determine what order to call numbers in, but at
bottom they are still calling a list of telephone numbers in some sequence.[7]
At the very least, if an autodialer has the technological capability to call a
list of telephone numbers in algorithmic order, then it necessarily has the
"capacity"—indeed, the *present* capacity—to call the numbers in
consecutive order.[8]

    Neither possible reading of the statute would impermissibly sweep in
common features like speed dialing and call forwarding, as Petitioners

---

[7] Most autodialers simply call through numbers one after another in the
order they are received. *See*, *e.g.*, *Moore*, 57 F. Supp. 3d at 654
(autodialer that "calls each record contained in the list in the order that
they are delivered to the hardware"); Hicks Decl. ¶ 5 (JA90) (device
that "send[s] telephone numbers contained in a database to the [dialer]
at a certain rate"). Other autodialers may call numbers in a different
order to maximize the likelihood that each call will be answered—
knowing, for example, that consumers on the East Coast will be home
eating dinner when consumers on the West Coast are still at work.

[8] Petitioners at times suggest (*e.g.*, Br. 31) that a device is not an
autodialer if it does not contain a "random or sequential number
generator" as an identifiable component. But nothing in the statute
requires that random or sequential numbers be generated by a special
component, nor is any special hardware or software needed to generate
sequential numbers. Consecutive or sequential number generation can
be as simple as repeatedly incrementing a number by one—a capability
present in the hardware of any autodialer, as Petitioners appear to
concede, *see* Br. 36 (quoting *Order* ¶ 16 & n.63 (JA1157)).

contend (Br. 6), because neither feature "automatic[ally]" calls a list of "numbers" (plural). *Cf.* 47 U.S.C. § 227(a)(1).  Speed dialing, for example, is simply a faster means to dial one number at a time.  Nor would either interpretation sweep in conference calls or group text messaging, which involve a single call that is then routed by the carrier to several recipients at once as part of a unified group conversation.  But if a device were to automatically send a series of text messages in separate bilateral conversations, that device would presumably be subject to the TCPA.  *Cf. Order* ¶¶ 34-37 (JA1165-67) (addressing similar technology).

Petitioners are therefore incorrect that the statutory definition of an autodialer is limited to rudimentary devices that call only random or consecutive numbers.  And even if there were *some* possible reading of the statute that could support that view, the ambiguity created by Congress's use of a "free-floating phrase" that does not "specify which * * * object[] is the one to which [it] relates" permits the Commission to adopt a different reading.  *Young*, 476 U.S. at 980-81.[9]

---

[9]  Petitioners also appear to argue, somewhat puzzlingly, that the *Omnibus Ruling* gave either too much or too little weight to the "the absence of human intervention."  Br. 33 (citing *Order* ¶ 17 (JA1157-58)).  But the Commission did not adopt any test for human intervention in this order, explaining that "[h]ow the human

## 2.    The FCC's Approach Is Reasonable.

Petitioners offer no sensible reason why Congress would have sought to prohibit automated calls to lists of random or consecutive numbers, but not to any other lists of numbers.  The FCC explained in past orders that such a distinction "would lead to an unintended result" by allowing callers to easily "circumvent[]" the TCPA's restrictions on autodialed calls, *2003 TCPA Order* ¶ 133, and "would be inconsistent with the avowed purpose of the TCPA and the intent of Congress in protecting consumers from such calls," *ACA Declaratory Ruling* ¶ 14.[10]  Courts have likewise found that "distinguish[ing] between objectionable calls made using automatic dialing software that pulls from a preprogrammed set of phone numbers and objectionable calls made using software that arbitrarily formulates telephone numbers would not serve the purpose of the statute." *Lardner*, 17 F. Supp. 3d at 1222; *see also*, *e.g.*, *Sterk v. Path, Inc.*, 46 F. Supp. 3d

---

intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." *Order* ¶ 17 (JA1158); *see also id.* ¶ 20 (JA1159) (denying one party's request to adopt a test for human intervention that would "amount[] to a simple variation on the 'present ability' arguments" that the Commission already rejected).

[10]    *See also* City of Chicago Comments 9-10 (JA12-13) (excluding devices that "use numbers from a database" would "create a nonsensical gap in the TCPA rules" and "create a distinction without a difference").

- 44 -

813, 820 (N.D. Ill.) (finding that the FCC's approach to autodialers "is well-reasoned and is appropriate to address the well-founded concerns by the FCC as to the threats posed to the public welfare and safety by certain telemarketing practices."), *perm. app. denied*, No. 14-8020 (7th Cir. 2014).

Petitioners' Intervenors and some *amici* posit that calling random or arbitrary numbers is uniquely problematic because this "might reach otherwise unlisted phone numbers, hospitals, or emergency organizations" and "tie up * * * emergency services lines." Intervenor Br. 18. But a stored list or database of numbers can also include emergency-service numbers and poses exactly the same problem. If this were Congress's driving concern, it could have simply prohibited automated calls to emergency-service numbers, without also restricting autodialed calls to wireless numbers; in fact, Congress considered and rejected an alternative bill that would have done just that.[11] *See* H.R. 2131, sec. 2, § 225(b)(3) (101st Cong. 1989). Instead, the record reflects that Congress viewed automated calls not just as a problem for emergency lines, but also as a profound threat to consumer privacy. *See*, *e.g.*, TCPA § 2(5), (9), (10), (12),

---

[11] Congress passed a separate law in 2012 to regulate automated calls to emergency-service numbers, *see infra* Part I.B.3, further undercutting Intervenors' argument that this was the sole object of the TCPA's autodialer restrictions.

(13), 105 Stat. at 2394-95 (describing automated calls as an "intrusive invasion of privacy," an affront to "[i]ndividuals' privacy rights," "a nuisance and an invasion of privacy" (twice), and a "nuisance and privacy invasion"); S. Rep. No. 102-178, at 2-3, 5, 9.

Petitioners' Intervenors and *amici* also suggest that devices that call stored lists of numbers should be permitted because they allow businesses to better communicate with customers with whom they have a preexisting relationship.  *See*, *e.g.*, Intervenor Br. 22.  The problem with that argument is that nothing in the TCPA distinguishes calls to a business's own customer list from calls to any other list.[12]  The same treatment would extend to calls to a list of all numbers in the phone book; to lists purchased or obtained from other, unrelated businesses; to "[m]arketing 'lead lists[]' compiled by data brokers from any number of sources," Privacy Rights Clearinghouse Comments 4 (JA132); or to lists of numbers captured or collected without consumers' knowledge or permission, *cf. Order* ¶¶ 34-35 (JA1165-66) (discussing an app that surreptitiously sends messages to all phone numbers in a user's address book).  That could not have been Congress's intent.

---

[12]  Unlike the TCPA's fax restrictions, the automated-call restrictions do not contain any established-business-relationship exception.  *Cf.* 47 U.S.C. § 227(b)(1)(C)(i).

Nor do devices that call stored lists of numbers need any special treatment in order for businesses to communicate with their customers. Applying the TCPA to these devices does not prohibit businesses from calling their own customers to deliver messages that customers want; it simply requires them to ask for their customers' consent. *See*, *e.g.*, *ACA Declaratory Ruling* ¶¶ 9, 14; Verizon Comments (JA119-28).  And if a customer withholds consent, businesses have no legitimate interest in calling lists of *uninterested* consumers for non-emergency purposes.

Petitioners' Intervenors and some *amici* also suggest that unwanted calls to wireless numbers are no longer problematic because "calls to wireless numbers are no longer [as] costly to consumers[] as they were in the early 1990s."  Intervenor Br. 5.  But unwanted calls to wireless numbers are problematic not only because of the costs incurred by consumers—which most consumers still pay, either on a per-call basis or by purchasing a fixed bucket of minutes or text messages, and which are a particular problem for low-income consumers, *see* Consumer Groups 12/18/13 Comments 6-7 (JA278-79)—but also because they are a serious intrusion on consumer privacy.  Congress recognized this in the TCPA, applying the autodialer restrictions *both* to "any telephone number assigned to a * * * cellular telephone service" and, separately, to "any

- 47 -

service for which the called party is charged for the call," 47 U.S.C. § 227(b)(1)(A)(iii), and requiring that calls must "not [be] charged to the called party" as only one of several conditions that must be satisfied to exempt calls from the autodialer restrictions, *see id.* § 227(b)(2)(C).

Petitioners and their supporters boast that using stored calling lists is more efficient than calling random or consecutive numbers. In restricting the use of autodialers, however, Congress recognized that the efficiency of automated dialing technology poses the problem; it is not the solution. *See* Consumer Groups 6/6/14 Ex Parte 2 (JA605); NASUCA Comments 6 (JA141). Since the TCPA does not apply to calls made with a consumer's consent, the only calls at issue are *uninvited* (and presumably *unwanted*) calls. *Cf.* Verizon Comments (JA119-28) (supporting the Commission's treatment of autodialers because automated calls can still be made with consent). Whereas increasing the efficiency of consensual calls may be a benefit, increasing the frequency of *unwanted* calls is only a nuisance.

If Petitioners were correct that the TCPA's autodialer restrictions apply only when calling random or consecutive numbers, it would effectively nullify these important consumer protections, as few if any callers today dial random or consecutive numbers. State Att'ys Gen.

Letter 3 (JA150); Consumer Groups 6/6/14 Ex Parte 10 (JA613). Yet the harms of unwanted calls made using automated equipment persist today; as the Federal Trade Commission found in a separate proceeding, modern automated dialing equipment "enables industry to shift some of its operational costs to consumers, who receive in return little, if any, benefit," and "the harm to consumers is very real." *Telemarketing Sales Rule*, 67 Fed. Reg. 4492, 4523-24 (Jan. 30, 2002). Petitioners' attempt to read the TCPA to ignore the harm caused by these devices is unreasonable.

### 3. Congress Has Ratified The FCC's Approach.

In the 12 years since the *2003 TCPA Order* ruled that the autodialer restrictions apply when using predictive dialers to call a stored list of numbers, and the seven years since the *ACA Declaratory Ruling* reaffirmed that conclusion, Congress has repeatedly ratified the FCC's approach to autodialers. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (When Congress "has not sought to alter [an agency's] interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.").

In 2011, Congress rejected proposed amendments that would have redefined an autodialer as "equipment which uses a random or sequential number generator to produce telephone numbers to be called and to dial

such numbers," H.R. 3035, sec. 2(a)(1) (112th Cong. 2011), in the face of overwhelming opposition from state attorneys general, *see* State Att'ys Gen. Letter (JA148-54), and consumer advocates, *see* Consumer Groups 11/3/11 Letter (JA145-47). After conducting a hearing, the bill's sponsors wrote that "[w]e have heard from our constituents" and that "there is no hope for this legislation." H.R. 3035 Withdrawal Letter (JA155); *see* Consumer Groups 12/18/13 Comments 4-5 (JA276-77); Consumer Groups 6/6/14 Ex Parte 4 (JA607).

The following year, in Section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, 126 Stat. 156, 243, Congress directed the FCC to create a special do-not-call registry for public safety answering points and to "prohibit the use of automatic dialing or 'robocall' equipment to establish contact with registered numbers." *See Public Safety Answering Point Registry*, 27 FCC Rcd. 13615, ¶ 3 (2012). "[A]utomatic dialing or 'robocall' equipment" is not defined anywhere, but these terms have long been used informally by the FCC to refer to equipment that it considers to be autodialers under the TCPA. *Id.* n.3, ¶ 29. When Congress enacted this new regulation of autodialer equipment in 2012, it presumably was aware of the FCC's 2003 and 2008 orders ruling that the autodialer restrictions apply to the use of predictive dialers

to call a stored list of numbers, and Congress's adoption of the FCC's terminology ratified those rulings. Indeed, excluding these devices from the 2012 autodialer legislation would defy common sense, because callers using stored lists of numbers would inexplicably be relieved of any obligation to ensure that they do not call emergency numbers, contrary to Congress's clear intent to protect emergency numbers from automated calls.

And this past October—months after the *Omnibus Ruling* was released and after it received considerable attention in Congress— Congress amended the TCPA in Section 301 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584, 588, to exempt from the TCPA's prerecorded-call and autodialer restrictions any call made to collect a government-backed debt. If Petitioners were correct that devices that can call any stored list of numbers (not just random or consecutive numbers) fall outside the TCPA's autodialer restrictions, then there would have been no need to exempt debt-collection calls from the autodialer restrictions; debt collectors do not go about calling random or consecutive numbers hoping to stumble upon someone who owes them an overdue debt. Congress's recent amendments to the TCPA thus confirm that Congress

shares the FCC's decade-old understanding that the TCPA's autodialer restrictions apply to devices used to call a stored list of telephone numbers.

### C.   The TCPA's Autodialer Restrictions Are Not Unconstitutionally Vague.

Finally, there is no merit to Petitioners' claim that, because the Commission has declined to adopt their preferred limiting principles, the autodialer definition is unconstitutionally vague.  That claim is anything but intuitive:  The TCPA has been on the books for nearly a quarter century, and in that time, no court has ever found the autodialer restrictions to be impermissibly vague.  *See*, *e.g.*, *Sterk*, 46 F. Supp. 3d at 820-21 (rejecting a similar vagueness challenge).  Petitioners offer no compelling reason to conclude otherwise here.

Petitioners can prevail on a facial vagueness challenge "only if the enactment is impermissibly vague in all of its applications."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  They have not come close to making that showing.  Even Petitioners admit that the autodialer restrictions clearly apply to devices with the present ability to call random or sequential telephone numbers, and the FCC has repeatedly made clear that predictive dialers—the principal dialing devices used today by telemarketers and other mass callers—are autodialers.  Conversely, it is clear that devices that do not

have the capacity to "store or produce telephone numbers," 47 U.S.C. § 227(a)(1)(A), or "to dial such numbers" on their own, *id.* § 227(a)(1)(B), are *not* autodialers. *See Order* ¶ 18 (JA1158).

Petitioners' vagueness challenge ultimately must rest on speculation that there are other calling devices that the FCC has not yet had opportunity to address. But Petitioners do not identify what any of those devices are, much less explain how any uncertainty concerning some devices could render the TCPA unconstitutionally vague "in *all* its applications," *Hoffman Estates*, 455 U.S. at 495 (emphasis added). Nor do Petitioners aver that they actually use or intend to use any such device; and if they wish to do so, they can simply petition the FCC for a declaratory ruling to clarify its status. *Cf. DiCola v. FDA*, 77 F.3d 504, 509 (D.C. Cir. 1996) (the "opportunity to obtain a prospective ruling" can provide "relief from [any] real uncertainty"). And if a caller declines to seek further guidance and chooses to proceed using equipment that may be regulated under the TCPA, "it is not 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C. Cir. 1992) (quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)).

II.   **THE COMMISSION REASONABLY CONCLUDED THAT CALLERS MUST OBTAIN NEW CONSENT FOR CALLS TO REASSIGNED WIRELESS NUMBERS, SUBJECT TO A ONE-CALL SAFE HARBOR.**

A.   **The Commission Reasonably Interpreted "Consent Of The Called Party" To Refer To The Person Whose Telephone Number Is Called.**

The Commission reasonably interpreted the term "consent of the called party" to refer to the consent of the current subscriber (or current customary user) of a telephone number—that is, the party whose number was actually called.   *Order* ¶¶ 74-75, 78-80 (JA1184-87).   Numerous decisions, which Petitioners all but ignore, support that interpretation. *See*, *e.g.*, *Osorio*, 746 F.3d at 1250-52; *Soppet*, 679 F.3d at 638-42; *Moore*, 57 F. Supp. 3d at 649-51; *see also Leyse v. Bank of Am. N.A.*, 804 F.3d 316, 325 n.13 (3d Cir. 2015); *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 724 (S.D.N.Y. 2015), *appeal filed*, No. 15-2474 (2d Cir.).   Petitioners, by contrast, cite no legal authority at all for their view (Br. 41-46) that this language unambiguously refers to the "expected recipient" or "intended recipient" of a call, rather than the person whose number is actually called.

Although Petitioners vigorously object to the Commission's ruling as a policy matter, they offer only a single legal argument regarding the meaning of the term "called party," and that argument is wholly

unpersuasive.  According to Petitioners, if you try to call your uncle but have the wrong number, "It would make perfect sense to say you are calling your uncle, and to refer to your uncle, the person you expect to answer, as the called party."  Br. 41 (internal quotation marks and alterations omitted).  It would be more accurate, however, to say that you tried to call your uncle but instead wound up calling a stranger, and to refer to that stranger—the "party" who was actually "called"—as the "called party."  And if your mother later asks you whether you've called your uncle recently, it would be incorrect to respond "Yes, I called him last week," if in fact you reached only a stranger and never spoke with your uncle.  Indeed, the Seventh Circuit has opined that "[n]o colloquial user of English would call [your uncle] the 'called party'" in this scenario.  *Soppet*, 679 F.3d at 641.

The statute's other uses of the term "called party" support the Commission's interpretation.  As Judge Easterbrook has explained, of the five other uses of that term in the TCPA, "[f]our unmistakably denote the current subscriber (the person who pays the bills or needs the line in order to receive other calls)," and the fifth "denotes whoever answers the call (usually the subscriber)."  *Soppet*, 679 F.3d at 640.  For example, as the Commission explained here, *Order* ¶ 74 (JA1184), two provisions discuss

whether the "called party" is "charged" for a call. 47 U.S.C. § 227(b)(1)(A)(iii), (b)(2)(C). These uses "must mean [the] current subscriber"—or someone connected to him or her, *see Order* ¶ 75 (JA1184)—"because only the current subscriber pays." *Soppet*, 679 F.3d at 639. Multiple other courts have agreed with this conclusion. *See*, *e.g.*, *Osorio*, 746 F.3d at 1251; *Moore*, 57 F. Supp. 3d at 649-50. And the congressional findings accompanying the TCPA likewise indicate that it is "the receiving party" who must "consent[] to receiving the call." TCPA § 2(12), 105 Stat. at 2394.

By contrast, nothing supports Petitioners' view that "called party" should turn on the intent or expectation of the caller. *Order* ¶ 78 (JA1185-86). "The phrase 'intended recipient' does not appear anywhere in [the statute], so what justification could there be for equating 'called party' with 'intended recipient of the call'?" *Soppet*, 679 F.3d at 640; *accord Osorio*, 746 F.3d at 1251; *Moore*, 57 F. Supp. 3d at 649. Petitioners' argument "does not rest on either a linguistic analysis of § 227 or the way the law understands consent." *Soppet*, 679 F.3d at 641. Nor can Petitioners' business interest in avoiding any liability for calls to reassigned numbers compel such an unnatural reading of the statute. *Id.* at 642.

The Commission's rejection of Petitioners' "expected recipient" approach is also reasonable as a matter of policy. Under that approach, the Commission warned, "unwitting recipients of reassigned numbers might face a barrage of telemarketing voice calls and texts." *Order* ¶ 79 (JA1186); *see*, *e.g.*, *Soppet*, 679 F.3d at 638 ("dozens of automated calls" to two reassigned numbers); *King*, 2015 WL 4103689, at *2 (163 robocalls to reassigned number, despite consumer's repeated pleas to stop calling). Indeed, the record contains "evidence that callers sometimes will not honor requests of new subscribers for a caller to cease calls to the newly acquired number." *Order* ¶ 82 (JA1187). Debt collectors, for example, "may have a policy to not speak to anyone other than the debtor," and so their calls "sometimes lack a means for consumers to ask that they stop, and can even instruct the consumer to hang up." *Id.* ¶ 79 (JA1186). These calls "are exactly the types that the TCPA is designed to stop." *Id.* ¶ 80 (JA1186).

An expected-recipient approach "would turn the TCPA's consumer protection on its head" by "plac[ing] the burden on new subscribers to inform the caller they are the wrong party and that they do not consent." *Order* ¶ 80 (JA1187). It would "effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted." *Ibid.*; *see also id.* ¶ 81 (JA1187)

("[T]he TCPA places responsibility on the caller alone to ensure that he or she has valid consent for each call," and "places no affirmative obligation on a called party to opt out of calls to which he or she never consented.").

Petitioners insist that the Commission's interpretation "would gut Congress's protection of * * * consensual communications" (Br. 42), but a call to a reassigned number where the current subscriber has not consented is not a "consensual" communication, and Petitioners' claim that they will be forced to cease making calls for which they actually have consent is unfounded. Petitioners say that they have "no reliable way to ascertain whether a given cell phone number has been reassigned" (Br. 42), but in fact callers have several means to limit their liability. For example, commercial databases already exist that claim to detect more than 80 percent of all reassignments, *Order* ¶ 86 & n.301 (JA1190), and the Commission's ruling creates strong incentives for the telemarketing industry to perfect those tools. Similarly, the *Omnibus Ruling* discusses many simple steps that callers can take to discover reassignments, including interactive opt-out mechanisms; training customer service agents to update records during incoming and outbound calls; periodically confirming contact information via email or during customers' visits to the caller's website or retail locations; and recognizing "triple-tone" or

"undeliverable" notices. *Id.* ¶ 86 & n.304 (JA1191).[13]

For the few reassignments that may go undetected, Petitioners' unsupported claim of "catastrophic" liability (Br. 43) is likewise overblown: Most people don't sue over a wrong-number call; they politely tell the caller that he or she has the wrong number and hang up.[14] *Cf.* Consumer Groups 12/22/14 Comments 4 (JA847). Regardless, requiring callers to possess *valid* consent when making autodialed calls to wireless numbers is not an impermissible restriction of consensual speech. *See infra* Part V.

## B. The One-Call Safe Harbor Is Not Arbitrary Or Capricious.

Because callers sometimes may not realize that a number has been reassigned until after they call the number and are unable to reach the intended recipient, the Commission allowed a one-call safe harbor to make it more likely that callers will have an opportunity to discover the

---

[13] Many of these measures are made even more effective by the *Omnibus Ruling*'s one-call safe harbor.

[14] Petitioners attempt to raise the specter of class-action lawsuits, pointing to just two instances where putative class actions involving calls to reassigned numbers have been filed (Br. 43), but not *certified*. It is not evident, and Petitioners do not attempt to show, that a class of nonconsenting recipients of calls to reassigned numbers could satisfy class-certification requirements such as ascertainability. *See Gannon v. Network Tel. Servs., Inc.*, --- F. App'x ---, 2016 WL 145811 (9th Cir. 2016); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 235-36 (S.D. Ill. 2011) (holding that a class of consumers with reassigned numbers could not be certified).

reassignment before facing liability. *Order* ¶¶ 85, 89-90 & n.312 (JA1190, 1192-93). Nothing in the Commission's interpretation of "called party" depends, however, on that safe harbor. *See id.* ¶¶ 74, 78-80 (JA1184, 1185-86). The Commission "could have interpreted the TCPA to impose a traditional strict liability standard on the caller: *i.e.*, a 'zero call' approach," *id.* n.312 (JA1192), but nonetheless elected to allow a safe harbor to reduce, albeit not eliminate, callers' potential liability.

Ignoring the old adage about looking a gift horse in the mouth, Petitioners complain (Br. 40, 42-43, 51-53) that this one-call safe harbor is unacceptable because it does not immunize them from *all* liability when they fail to learn that a number has been reassigned. These complaints overlook that, until it is possible to reliably identify all reassigned numbers, *someone* must "bear[] the risk in situations where robocalls are placed to reassigned wireless numbers." *Order* n.312 (JA1192). It was not unreasonable for the Commission to decide that, subject to the limited safe harbor, "when a caller chooses to make robocalls to a wireless number that may have been reassigned, it is the caller—and not the wireless recipient of the call—who bears the risk." *Id.* (JA1193). If callers nonetheless want to reach consumers without any risk of liability, they can do so by employing live operators and making calls manually rather than using autodialers.

Petitioners' related argument that "[a]n agency that acknowledges a problem and sets out to address it must go some meaningful distance toward solving it" (Br. 51) is misguided in multiple respects. First, Petitioners misapprehend the problem that the Commission sought to address: It did not seek to protect callers from all risk of liability, but instead to "strike [an] appropriate balance" and "find a middle ground." *Order* ¶¶ 89-90 & n.312 (JA1192). Second, Petitioners ignore that the one-call safe harbor *does* go a substantial distance in reducing the risk to callers (and "'do[es] so in [a] rational way,'" Br. 54), even though it does not eliminate *all* risk. "[T]he Government may be said to advance its purpose by substantially reducing [a problem], even where it is not wholly eradicated." *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993).

## III. THE COMMISSION REASONABLY RULED THAT CALLERS MUST ALLOW CONSUMERS TO REVOKE CONSENT BY ANY REASONABLE MEANS.

Petitioners here do not dispute that the TCPA permits consumers who have consented to receive certain robocalls to later revoke that consent—a right that has been recognized by numerous courts. *See*, *e.g.*, *Osorio*, 746 F.3d at 1252, 1255-56; *Gager*, 727 F.3d at 270-72; *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F. Supp. 2d 962, 975-80 (W.D. Wis. 2013); *see also Munro v. King Broad. Co.*, 2013 WL 6185233, at *3 (W.D.

Wash. 2013) (collecting cases).[15]

The only question before this Court is *how* a consumer may go about revoking consent, an issue on which the statute is silent. Because Congress did not directly speak to this issue in the statute, *Chevron* accords the Commission broad authority to fill this gap. *Order* ¶ 56 (JA1176) (citing *Chevron*, 467 U.S. at 843-44); *Brand X*, 545 U.S. at 980-81. In the *Omnibus Ruling*, the Commission exercised that authority to rule that the TCPA allows consumers to revoke consent by any reasonable means and that callers may not unilaterally restrict consumers' ability to revoke consent by designating their own exclusive revocation procedures. Petitioners' objections to that ruling are meritless.

**1.** Whether and how statutory rights may be waived or modified depends on the underlying statute. Petitioners concede (Br. 63) that statutory rights cannot be waived when a statute states that the rights are

---

[15] Some parties argued before the agency that, because the TCPA's fax provisions were amended in 2005 to establish specific procedures for consumers to request that a business stop sending them unwanted faxes, the absence of such a provision for robocalls means that Congress meant to forbid consumers from ever revoking consent. *See Order* ¶ 69 (JA1181). No petitioner here adopts that argument, which is wrong in any event. *See ibid.*; *Beal*, 956 F. Supp. 2d at 978-79 ("Congress's decision to impose particular requirements regarding faxed advertisements does not mean that Congress intended to limit opt-out options for autodialed calls."); *see also Gager*, 727 F.3d at 270 (addressing same provision).

nonwaivable.  And the FCC does not dispute that statutory rights can be waived by consumers if a statute says that they *are* waivable.  Because Congress did not directly address in the TCPA whether callers can make consumers waive (in whole or in part) their right to revoke consent, it falls to the agency to fill this statutory gap by "provid[ing] a reasonable construction of the TCPA's terms."  *Order* ¶ 63 (JA1179).

The FCC reasonably determined that, in view of the TCPA's goal of protecting consumer privacy from intrusion by unwanted calls, callers cannot be allowed to unilaterally restrict or impair consumers' right to revoke consent.  "[T]o allow callers to designate the exclusive means of revocation," the Commission explained, could "materially impair that right" by allowing callers to "impose[] additional burdens" that "materially diminish the consumer's ability to revoke."  *Order* ¶ 66 (JA1180).  That approach "would place a significant burden on the called party who no longer wishes to receive such calls, which is inconsistent with the TCPA." *Id.* ¶ 67 (JA1180).  By contrast, allowing consumers to revoke consent by any reasonable means "gives consent its most appropriate meaning within the consumer-protection goals of the TCPA." *Id.* ¶ 56 (JA1177); *see Gager*, 727 F.3d at 271.

- 63 -

Petitioners essentially ask the Court to rule that if the statute does not specifically forbid a waiver of statutory rights, then it must be read to unambiguously permit those rights to be waived or modified by contract. *See* Br. 61-63.  The *Omnibus Ruling* did not address the situation where a caller asks consumers to contractually agree to certain revocation procedures in a voluntary agreement,[16] but Petitioners' position is in any event contrary to *Chevron*, which holds that a statute is ambiguous unless "Congress has directly spoken to the precise question at issue."  467 U.S. at 842; *accord*, *e.g.*, *City of Arlington*, 133 S. Ct. at 1868; *Rust v. Sullivan*, 500 U.S. 173, 184 (1991).  Congress has not unambiguously foreclosed the FCC's ruling that the TCPA allows consent to be revoked by any reasonable means.

Petitioners' authorities likewise do not foreclose the Commission's ruling.  Petitioners point (Br. 61) to a Restatement provision and a Seventh Circuit decision each involving contractual rights, but the fact that parties assuming *contractual* obligations may tailor those rights by contract says nothing about *statutory* rights.  Petitioners also cite (Br. 63)

---

[16] The *Omnibus Ruling* denied a petition asking the Commission to allow callers to unilaterally "designate" an exclusive revocation procedure. *See, e.g.*, *Order* ¶ 63 (JA1179).  The Commission's ruling did not address whether contracting parties can select a particular revocation procedure by mutual agreement.

a case involving a statute designed to allow labor rights to be negotiated through collective-bargaining agreements, *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 80 (1953), but no similar statutory authorization is present here. Finally, Petitioners cite (Br. 63) cases involving evidentiary and procedural rules, *United States v. Mezzanatto*, 513 U.S. 196, 200-03 (1995), and statutes of limitations, *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 611-12 (2013), but neither case addressed *substantive* rights, and neither case involved (much less overrides) an authoritative interpretation of a statute by an agency charged with the power to administer that statute.

Furthermore, unlike in all of Petitioners' authorities, the underlying statutory right here—to revoke consent—is itself implicit, so the mere absence of a provision addressing waiver of that right cannot give rise to the kind of negative inference that Petitioners seek. None of these authorities unambiguously authorizes callers to unilaterally restrict consumers' substantive right to revoke consent.

**2.** Petitioners' exaggerated claims about the difficulty of complying with the Commission's ruling are unfounded. Nothing in the *Omnibus Ruling* supports Petitioners' claim (Br. 57) that consumers "could tell the pizza-delivery guy that they no longer wish to receive promotional text

messages." The order is clear that consumers may revoke consent only by *reasonable* means, and that a method of revocation would be unreasonable if it would be "overly burdensome to implement mechanisms to record and effectuate a consumer's request." *Order* ¶ 64 (JA1179). Nor is there any merit to Petitioners' complaints (Br. 58) about "[t]he open-endedness of the Order's 'reasonableness' standard." Reasonableness is a familiar concept in the law; requiring callers to honor a consumer's reasonable revocation requests is no more demanding than requiring them to exercise reasonable care.

And it is hardly a ground for objection that the Commission's ruling will require Petitioners to actually review, rather than ignore, their own customers' responses to their communications. *See* Pet. Br. 56. A central purpose of the TCPA was to require the use of live operators in place of "automated calls [that] cannot interact with the customer except in preprogrammed ways" and that "do not allow the caller to feel the frustration of the called party." S. Rep. No. 102-178, at 4. Petitioners' mere desire "to reach large numbers of consumers efficiently" (Br. 57) does not trump the rights conferred on consumers by the TCPA.

Petitioners argue (Br. 58-60) that in some particular contexts, it might be possible to capture many reasonable means of revocation through

"standardized revocation procedures." But it was reasonable for the Commission to decline to adopt that approach, because "specific regulations cannot begin to cover all of the infinite variety of conditions which [consumers] must face." *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) (internal quotation marks and alteration omitted). It is not possible to anticipate every possible means by which every possible caller might communicate with every one of its customers about every possible matter. Nor do callers have any legitimate interest in refusing a "consumer's repeated reasonable attempts to revoke consent" simply because the consumer may be unaware of a particular standardized revocation procedure. *Order* ¶ 67 (JA1180). The Commission's ruling that consumers may revoke consent by any reasonable means was a reasonable exercise of agency discretion.[17]

---

[17] Although callers cannot *require* consumers to use a particular revocation procedure, they can still protect themselves by providing consumers with easy and convenient mechanisms for revoking consent. Consumers who are offered a simple way to revoke consent are unlikely to instead resort to unusual or aberrant means of communicating their desire to stop receiving automated messages.

IV. **THE COMMISSION REASONABLY EXEMPTED CERTAIN HEALTHCARE CALLS TO WIRELESS NUMBERS.**

Petitioner Rite Aid contends that it is arbitrary or capricious to exempt healthcare-related calls to wireless numbers only when those calls serve a healthcare-treatment purpose, and not when the calls instead serve non-treatment purposes such as telemarketing, advertising, billing, or debt collection. That contention is baseless.

**1.** Rite Aid is incorrect (Br. 8-9) that the *Omnibus Ruling*'s exemption for certain healthcare calls *to wireless numbers* is an unexplained change to the Commission's 2012 exemption for certain other healthcare calls *to residential numbers*. Rite Aid's premise that the 2012 regulations exempted "HIPAA-protected calls to residential *and* wireless numbers" from the statutory consent requirement (Br. 4-5) misreads those regulations: 47 C.F.R. § 64.1200(a)(3)(v) exempts only calls *to residential numbers* from the consent requirement, and § 64.1200(a)(2) exempts healthcare calls only from the heightened *written*-consent standard for telemarketing calls; nothing in the 2012 regulations exempted healthcare calls *to wireless numbers* from the *statutory consent requirement*, which is implemented in § 64.1200(a)(1). *See Order* n.471 (JA1211-12). This is confirmed by the order adopting those regulations, which repeatedly stated

- 68 -

that the Commission was addressing only calls "to residential lines." *2012 TCPA Order* ¶¶ 2, 18, 57-58; *accord* Intervenor Br. 35. The *Omnibus Ruling* is the first time that the Commission has exempted healthcare calls to wireless numbers from the statutory consent requirement.

**2.** Rite Aid also misses the mark in arguing (Br. 9-10) that the Commission impermissibly adopted a narrower exemption for calls to wireless numbers than for calls to residential numbers.

Rite Aid appears to believe that the exemption for calls to residential numbers covers calls unrelated to healthcare treatment. But the Commission was clear when adopting that exemption that it covers only calls "intended to communicate health care-related information rather than to offer property, goods, or services." *2012 TCPA Order* ¶ 63. Indeed, the Commission noted that its exemption authority allowed it to exempt calls to residential numbers *only* if the calls do not contain unsolicited advertisements. *Ibid.* (citing 47 U.S.C. § 227(b)(2)(B)(ii)(II)).

But even if the exemption for calls to wireless numbers were potentially narrower than the exemption for calls to residential numbers, that would not be arbitrary or capricious. Although Rite Aid may believe that there are "reasons for treating residential and wireless telephone lines the same" (Br. 9), the TCPA treats them differently. These two

categories of calls are subject to different statutory prohibitions, *compare* 47 U.S.C. § 227(b)(1)(A) *with id.* § 227(b)(1)(B), and different exemption authority, *compare id.* § 227(b)(2)(B) *with id.* § 227(b)(2)(C). The exemption authority for calls to wireless numbers imposes additional conditions, such as that calls "not [be] charged to the called party," *ibid.*, that do not apply when exempting calls to residential numbers. Moreover, calls to mobile phones can be more costly and more intrusive than calls to residential numbers. Given these differences, it cannot be arbitrary or capricious to grant a narrower exemption for healthcare calls to wireless numbers than for calls to residential numbers.

**3.** Rite Aid likewise fails to show (Br. 10-11) that it was arbitrary or capricious to distinguish calls made for a healthcare-treatment purpose from calls made for other purposes, such as telemarketing, advertising, billing, or debt collection. The Commission reasonably determined that "calls regarding billing and accounts" do not "warrant the same treatment as calls for healthcare treatment purposes," because "[t]imely delivery of these types of messages is not critical to a called party's healthcare, and they therefore do not justify setting aside a consumer's privacy interests." *Order* ¶ 146 (JA1214). Nor does the fact that some non-treatment calls are covered by HIPAA mean that the TCPA must treat them the same as

healthcare-treatment calls. *Cf.* 47 U.S.C. § 227(b)(1)(C) (authorizing the Commission to prescribe any necessary conditions when granting exemptions).[18]

**4.** Rite Aid raises two other issues, neither of which can be considered by this Court because, as a threshold matter, they were never presented to the Commission. *See* 47 U.S.C. § 405(a).

First, Rite Aid contends (Br. 10) that the Commission should have considered the TCPA's emergency-purposes exception. That statutory exception for calls made "for emergency purposes," 47 U.S.C. § 227(b)(1)(A), (B), is separate from the exemption authority invoked here, *id.* § 227(b)(2)(C). Neither the underlying petition, *see* AAHAM Pet. 9-12 (JA801-04), nor any other party asked the Commission to address that exception. Regardless, Rite Aid has not identified any HIPAA-covered healthcare calls that would fall within the statutory exception for calls made for an emergency purpose, but outside the *Omnibus Ruling*'s exemption for "calls for which there is exigency and that have a healthcare

---

[18] Rite Aid also objects (Br. 10-11) to the Commission's use of the word "exigency." As the *Omnibus Ruling* indicates, this simply limits the exemption to calls that contain "time-sensitive information" and require "[t]imely delivery" and "timely receipt." *Order* ¶ 145-146 (JA1213-14). Automated calls that simply exhort consumers to "exercise regularly" or "eat healthfully," for example, would not qualify.

treatment purpose." *See Order* ¶ 146 & n.490 (JA1214). Should such calls arise, parties can rely on the emergency-purposes exception on a case-by-case basis.

Second, Rite Aid contends (Br. 11-12) that the Commission's ruling somehow "conflict[s] with HIPAA." But Rite Aid identifies nothing in HIPAA that exempts any call from the TCPA or that purports to supersede the TCPA's consent requirement. HIPAA and the TCPA are separate statutes that serve different purposes. *See* Consumer Groups 2/23/15 Letter 3-4 (JA923-24). Whereas HIPAA gives patients control over how their protected information is used and disclosed to others, the TCPA protects consumer privacy by allowing consumers to choose which automated calls they wish to receive.

## V.    THE TCPA'S TIME, PLACE, AND MANNER RESTRICTIONS ARE CONSTITUTIONAL.

Although Petitioners do not directly challenge the TCPA's constitutionality, they argue that the Court should reject the FCC's otherwise-permissible interpretations of the statute to avoid "'serious constitutional questions.'" Br. 25; *see also* Br. 47. That argument is a red herring. Although this Court has said that constitutional avoidance can sometimes outweigh agency deference, the Court "do[es] not abandon

*Chevron* deference at the mere mention of a possible constitutional problem; the argument must be serious." *Kempthorne*, 512 F.3d at 711; *see also Rust*, 500 U.S. at 191 (where regulations "do not raise the sort of 'grave and doubtful constitutional questions' that would lead us to assume Congress did not intend to authorize their issuance * * * we need not invalidate the regulations in order to save the statute from unconstitutionality").[19]

Petitioners' constitutional-avoidance arguments are misplaced because there is no serious doubt, much less grave doubt, about the constitutionality of the TCPA's time, place, and manner restrictions, and

---

[19] This Circuit's holding that constitutional avoidance can sometimes override an agency interpretation is at odds with the Supreme Court's more recent holding that mere constitutional avoidance—unlike an actual *finding* of unconstitutionality—does not "bear[] upon judicial review of authorized agency action." *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1812 & n.3 (2009). Other circuits hold that "once an ambiguous statute has been interpreted by the agency in charge of its implementation," courts "lack the 'authority to re-construe the statute even to avoid potential constitutional problems.'" *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008) (quoting *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc)); *see also* Christopher J. Walker, *Avoiding Normative Canons in the Review of Administrative Interpretations of Law*, 64 Admin. L. Rev. 139, 150-56, 168-80, 188-89 (2012) (explaining that constitutional avoidance and other normative canons must yield to authoritative agency interpretations). And the canon of constitutional avoidance, which governs the interpretation of ambiguous statutes by a court, should not apply after any potential ambiguity has already been removed by an authoritative agency interpretation.

thus "there is nothing to avoid." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 709 (D.C. Cir. 2011) (rejecting constitutional-avoidance argument in a First Amendment challenge to FCC regulations); *see also Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 409 (D.C. Cir. 1996) (rejecting constitutional-avoidance challenge to an agency interpretation because the court could "easily resolve [petitioners'] First Amendment challenges through the application of controlling precedent"). Every court to consider these provisions has held that they easily pass muster under the First Amendment. *See, e.g.*, *Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995); *Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378 (N.D. Ga. 2013); *In re Jiffy Lube*, 847 F. Supp. 2d at 1260-62; *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1011-12 (N.D. Ill. 2010); *Joffe*, 121 P.3d at 841-43.

Content-neutral time, place, and manner restrictions must be upheld if they "serve a significant governmental interest," are "narrowly tailored" to serve that interest, and "leave open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted); *see also Moser*, 46 F.3d at 973-74. The TCPA provisions at issue easily satisfy that test.

Protecting consumers from the intrusion of unwanted calls is undoubtedly a significant governmental interest. The TCPA safeguards consumer privacy, prevents the nuisance and disruption resulting from a barrage of unwanted automated calls, and protects against the uninvited costs many users incur for incoming calls on cellular phones. *See*, *e.g.*, *Wreyford*, 957 F. Supp. 2d at 1380; *In re Jiffy Lube*, 847 F. Supp. 2d at 1261; *Lozano*, 702 F. Supp. 2d at 1011; *see also* TCPA § 2(5)-(6), (10), 105 Stat. at 2394; S. Rep. No. 102-178, at 2, 4-5. The harms inflicted by unwanted calls are especially great for calls to residential phones, which pierce the sanctity of the home, and to mobile phones, which many consumers keep on their person at all times. *Joffe*, 121 P.3d at 842.

The TCPA is tailored to serve that interest. "[N]arrow tailoring is satisfied 'so long as the regulation * * * promotes a substantial governmental interest that would be achieved less effectively absent the regulation,'" *Ward*, 491 U.S. at 799, even if the regulation might "not be the least restrictive or least intrusive means of doing so," *id.* at 798. The statute is narrowly tailored to address the flood of unwanted calls caused by automated calling technology: It does not regulate live calls that are manually dialed without an autodialer; it does not ban all automated calls, but simply requires that the caller obtain the consumer's consent; and it

restricts only the particular forms of automated calls that Congress found most invasive and problematic—calls to residential and wireless numbers using an artificial or prerecorded voice, and calls to wireless numbers made using an autodialer. *See*, *e.g.*, *Wreyford*, 957 F. Supp. 2d at 1381.

The TCPA leaves open ample alternative channels for Petitioners and others to communicate any message they wish. Callers remain free, for example, to make as many calls as they choose by having live operators manually dial each number. *Order* ¶ 84 (JA1189); *Moser*, 46 F.3d at 975; *Joffe*, 121 P.3d at 842. They may also freely communicate through other means, such as e-mail and postal mail. *Wreyford*, 957 F. Supp. 2d at 1382. And, of course, they can even continue to communicate through automated calls by simply obtaining consumer consent. *Ibid.*

Nothing in the *Omnibus Ruling* changes this analysis, and Petitioners' unsupported accusation that the *Omnibus Ruling*'s interpretation of the TCPA will unduly deter businesses from communicating with their customers is baseless. The FCC has held that predictive dialers are autodialers since 2003; *Soppet* held that callers are liable for calls to reassigned wireless numbers in 2012; *Gager* upheld consumers' right to revoke consent in 2013; and the FCC's exercise of its exemption authority fosters *greater* communication. Petitioners have been

- 76 -

able to communicate effectively under these rules for years, and will continue to do so under the *Omnibus Ruling*.

## CONCLUSION

The petitions for review should be denied.

Dated:  January 15, 2016

Respectfully submitted,

/s/  *Scott M. Noveck*

Jonathan B. Sallet
    *General Counsel*

David M. Gossett
    *Deputy General Counsel*

Jacob M. Lewis
    *Associate General Counsel*

William J. Baer
    *Assistant Attorney General*

Scott M. Noveck
    *Counsel*

Kristen C. Limarzi
Steven J. Mintz
    *Attorneys*

FEDERAL COMMUNICATIONS
    COMMISSION

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

445 12th Street SW
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's Order of October 13, 2015, because:

    ☒    this brief contains <u>16,339</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), *or*

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2013</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐    this brief has been prepared in a monospaced spaced typeface using _____ with _____.


<u>/s/  *Scott M. Noveck*</u>
Scott M. Noveck
*Counsel for Respondents*

## CERTIFICATE OF FILING AND SERVICE

I, Scott M. Noveck, hereby certify that on February 24, 2016, I filed the foregoing Brief for Respondents with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system and by causing eight copies to be mailed to the Clerk of Court by first-class mail. Participants in the case, listed below, who are registered CM/ECF users will be served electronically by the CM/ECF system. Some participants, marked with an asterisk, are not CM/ECF users; I certify that I have caused paper copies of the foregoing document to be served on those participants by first-class mail, unless another attorney for the same party is receiving electronic service.

/s/ *Scott M. Noveck*

Scott M. Noveck
*Counsel for Respondents*

**Service List:**

Brian Ross Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
bmelendez@dykema.com

*Counsel for Petitioner*
  *ACA International*

Shay Dvoretzky
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
sdvoretzky@jonesday.com

*Counsel for Petitioners*
  *Sirius XM Radio Inc. and*
  *Professional Association for*
  *Consumer Engagement, Inc.*

- 79 -

*[Service List Continued from Previous Page]*

Tonia Ouellette Klausner
WILSON SONSINI GOODRICH
   & ROSATI
1301 Avenue of the Americas
40th Floor
New York, NY 10019
tklausner@wsgr.com

*Counsel for Petitioners
   salesforce.com inc. and
   ExactTarget, Inc.*

Amy Lynn Brown
*Monica Shah Desai
*Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037-1350
amy.brown@squirepb.com

*Counsel for Petitioner
   Consumer Bankers Association*

Steven Paul Lehotsky
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
slehotsky@uschamber.com

*Counsel for Petitioner
   Chamber of Commerce of the
   United States of America*

Helgi C. Walker
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
hwalker@gibsondunn.com
lsee@gibsondunn.com

*Counsel for Petitioner
   Chamber of Commerce of the
   United States of America*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW
8th Floor
Washington, DC 20036
cwright@wiltshiregrannis.com
jbagg@hwglaw.com
abonner@hwglaw.com

*Counsel for Petitioner
   Vibes Media, LLC*

Paul Anthony Werner, III
*Brian David Weimer
SHEPPARD MULLIN RICHTER
   & HAMPTON LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
pwerner@sheppardmullin.com

*Counsel for Petitioner
   Rite Aid Hdqtrs. Corp.*

*[Service List Continued from Previous Page]*

Robert Allen Long, Jr.
Yaron Dori
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
rlong@cov.com
ydori@cov.com

*Counsel for Petitioner Portfolio*
  *Recovery Associates, LLC*

Thomas Collier Mugavero
WHITEFORD TAYLOR
  & PRESTON, LLP
3190 Fairview Park Drive
Suite 300
Falls Church, VA 22042
tmugavero@wtplaw.com

*Counsel for Intervenors Cavalry*
  *Portfolio Services, LLC,*
  *Diversified Consultants, Inc.,*
  *MRS BPO LLC, and Mercantile*
  *Adjustment Bureau, LLC*

Jonathan Goldman Cedarbaum
*Jonathan Edward Paikin
WILMER CUTLER PICKERING HALE
  & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006-1420
jonathan.cedarbaum@wilmerhale.com

*Counsel for Intervenor*
  *National Association of*
  *Federal Credit Unions*

Steven A. Augustino
KELLEY DRYE & WARREN LLP
3050 K Street, NW
Suite 400
Washington, DC 20007
saugustino@kelleydrye.com

*Counsel for Intervenors Conifer*
  *Revenue Cycle Solutions, LLC,*
  *Council of American Survey*
  *Research Organizations, and*
  *Marketing Research Association*

Blaine Christopher Kimrey
Bryan Kyle Clark
VEDDER PRICE, PC
222 North La Salle Street,
Suite 2600
Chicago, IL 60601
bkimrey@vedderprice.com
bclark@vedderprice.com

*Counsel for Intervenor*
  *Gerzhom, Inc.*

Bryan Nicholas Tramont
Russell Paul Hanser
WILKINSON BARKER KNAUER, LLP
1800 M Street, NW
Suite 800N
Washington, DC 20036
btramont@wbklaw.com
rhanser@wbklaw.com

*Counsel for Amicus Curiae*
  *CTIA—The Wireless Association*

*[Service List Continued from Previous Page]*

Harvey L. Reiter
STINSON LEONARD STREET LLP
1775 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-4605
harvey.reiter@stinsonleonard.com

*Counsel for Amici Curiae*
*American Gas Association,*
*Edison Electric Institute,*
*National Association of Water*
*Companies, and National Rural*
*Electric Cooperative Association*

Donald Louis Bell, II
NATIONAL ASSOCIATION OF
CHAIN DRUG STORES
1776 Wilson Boulevard
Suite 200
Arlington, VA 22209
dbell@nacds.org

*Counsel for Amicus Curiae*
*National Association of*
*Chain Drug Stores*

*Andrew Brian Clubok
Devin Scott Anderson
KIRKLAND & ELLIS LLP
655 15th Street, NW
Suite 1200
Washington, DC 20005
aclubok@kirkland.com
devin.anderson@kirkland.com

*Counsel for Amicus Curiae*
*The Internet Association*

Joseph R. Palmore
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
JPalmore@mofo.com

*Counsel for Amici Curiae*
*Retail Litigation Center, Inc.,*
*National Retail Federation, and*
*National Restaurant Association*

Charles H. Kennedy
THE KENNEDY PRIVACY LAW FIRM
1050 30th Street, NW
Washington, DC 20007
ckennedy@kennedyonprivacy.com

*Counsel for Amici Curiae American*
*Bankers Association, Credit*
*Union National Association,*
*and Independent Community*
*Bankers of America*

Amy Marshall Gallegos
JENNER & BLOCK LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
agallegos@jenner.com

*Counsel for Amicus Curiae*
*Communication Innovators*

*[Service List Continued from Previous Page]*

Eric J. Troutman
SEVERSON & WERSON
19100 Von Karman Avenue
Suite 700
Irvine, CA 92612
ejt@severson.com

*Counsel for Amici Curiae American
  Financial Services Association,
  Consumer Mortgage Coalition,
  and Mortgage Bankers
  Association*

Craig L. Briskin
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW
Suite 300
Washington, DC 20036
cbriskin@findjustice.com

*Counsel for Amici Curiae
  National Consumer Law Center,
  National Association of
  Consumer Advocates,
  Consumers Union, AARP,
  Consumer Federation of
  America, and MFY Legal
  Services*

Charles Messer
CARLSON & MESSER LLP
5959 W Century Boulevard
Los Angeles, CA 90045
MesserC@cmtlaw.com

*Counsel for Amicus Curiae
  Charles R. Messer*

Marc Rotenberg
Alan Jay Butler
ELECTRONIC PRIVACY INFORMATION
  CENTER
1718 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
rotenberg@epic.org
butler@epic.org

*Counsel for Amicus Curiae
  Electronic Privacy Information
  Center et al.*

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM CONTENTS

**Page**

Telephone Consumer Protection Act of 1991, *as amended*,
    47 U.S.C. § 227...........................................................................Add. 2

Telephone Consumer Protection Act of 1991,
    Pub. L. No. 102-243, 105 Stat. 2394.........................................Add. 4

Middle Class Tax Relief and Job Creation Act of 2012,
    Pub. L. No. 112-96, § 6507, 126 Stat. 156 ...............................Add. 6

Bipartisan Budget Act of 2015,
    Pub. L. No. 114-74, § 301, 129 Stat. 584 .................................Add. 6

47 C.F.R. § 64.1200 .......................................................................Add. 7

The Telephone Consumer Protection Act of 1991, *as amended*, 47 U.S.C. § 227, provides in pertinent part:

### § 227. Restrictions on use of telephone equipment

### (a) Definitions

As used in this section—

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

*        *        *

### (b) Restrictions on use of automated telephone equipment

### (1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

Add. 2

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

\*    \*    \*

## (2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection.   In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement;

(C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

\*    \*    \*

Add. 3

The Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394, provides in pertinent part:

\*    \*    \*

## SEC. 2. FINDINGS

The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

(9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

(11)  Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.

(12)  Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

(13)  While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14)  Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.

(15) The Federal Communications Commission should consider adopting reasonable restrictions on automated or prerecorded calls to businesses as well as to the home, consistent with the constitutional protections of free speech.

\*       \*       \*

## SEC. 3. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT

\*       \*       \*

(c) DEADLINE FOR REGULATIONS; EFFECTIVE DATE.—

(1) REGULATIONS.—The Federal Communications Commission shall prescribe regulations to implement the amendments made by this section not later than 9 months after the date of enactment of this Act.

\*       \*       \*

Add. 5

Section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, 126 Stat. 156, provides in pertinent part:

### SEC. 6507. COMMISSION PROCEEDING ON AUTODIALING.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Commission shall initiate a proceeding to create a specialized Do-Not-Call registry for public safety answering points.

(b) FEATURES OF THE REGISTRY.—The Commission shall issue regulations, after providing the public with notice and an opportunity to comment, that— * * *

(5) prohibit the use of automatic dialing or "robocall" equipment to establish contact with registered numbers.

(c) ENFORCEMENT.—The Commission shall— * * *

(2) establish monetary penalties for violations of the prohibition on automatically dialing registered numbers established pursuant to subsection (b)(5) of not less than $10,000 per call nor more than $100,000 per call; * * *

\*      \*      \*

Section 301 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 provides in pertinent part:

### SEC. 301 DEBT COLLECTION IMPROVEMENTS.

(a) IN GENERAL.—Section 227(b) of the Communications Act of 1934 (47 U.S.C. 227(b)) is amended—

(1) in paragraph (1)—

(A) in subparagraph (A)(iii), by inserting ", unless such call is made solely to collect a debt owed to or guaranteed by the United States" after "charged for the call"; and

(B) in subparagraph (B), by inserting ", is made solely pursuant to the collection of a debt owed to or guaranteed by the United States," after "purposes"; * * *

\*      \*      \*

Add. 6

47 C.F.R. § 64.1200 provides in pertinent part:

### § 64.1200  Delivery restrictions.

(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

(iv) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service, provided the number is not already on the national do-not-call registry or caller's company-specific do-not-call list.

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

Add. 7

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call;

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

\*    \*    \*

(b) All artificial or prerecorded voice telephone messages shall:

\*    \*    \*

(3) In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii), provide an automated, interactive voice- and/or key press-activated opt-out mechanism[.] * * * When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism[.] * * *

\*    \*    \*

(f) As used in this section:

(1) The term *advertisement* means any material advertising the commercial availability or quality of any property, goods, or services.

(2) The terms *automatic telephone dialing system* and *autodialer* mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

\*    \*    \*

Add. 8

(8) The term *prior express written consent* means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

*   *   *

(12) The term *telemarketing* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

*   *   *